Donna A. DORIA, Plaintiff,

v.

CRAMER ROSENTHAL McGLYNN, INC., Gerald B. Cramer, Edward J. Rosenthal, Ronald H. McGlynn, Jay B. Abramson, Fred Filoon, and Arthur J. Pergament, Defendants.

No. 95 CV 3164.

United States District Court, S.D. New York.

Oct. 15, 1996.

Jonathan Lovett, Lovett & Gould, White Plains, NY, for Plaintiff.

Robert Holtzman, Kevin LeBlanc, Kramer Levin Naftalis & Frankel, New York City, for Defendants.

## MEMORANDUM DECISION AND ORDER

PARKER, District Judge.

Plaintiff Donna I. Doria ("Doria") brings this action against defendants Cramer Rosenthal McGlynn, Inc. ("CRM"), Gerald B. Cramer ("Cramer"), Edward J. Rosenthal ("Rosenthal"), and Ronald H. McGlynn ("McGlynn") for violations of the Equal Pay Act of 1963, 29 U.S.C. § 206; discrimination and retaliation in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.;* and retaliation in violation of 29 U.S.C. § 215.[1] Doria also brings pendent state law claims of age, gender and retaliatory discrimination under the New York State Human Rights Law, as amended, N.Y.Exec.Law § 296 *et seq.*

Doria alleges that during the course of her employment with CRM she, due to age, gender and retaliatory discrimination, was denied a promotion, and failed to receive certain benefits and fair wages. Doria's first claim alleges a violation of the Equal Pay Act. The second, fourth, seventh and eighth claims allege retaliation in violation of 29 U.S.C. § 215, 42 U.S.C. § 2000e *et seq.* and N.Y.Exec.Law § 296 *et seq.* The third and fifth claims allege gender-based discrimina-

tion in violation of 42 U.S.C. § 2000e *et seq.* and N.Y.Exec.Law § 296 *et seq.* and the sixth claim alleges age-based discrimination in violation of N.Y.Exec.Law § 296 *et seq.*

Before this Court is defendants' motion for summary judgment, pursuant to Fed. R.Civ.P. 56(b). Defendants' motion is granted in part and denied in part.

## FACTS

Plaintiff has submitted an affidavit, consisting of excerpts of deposition testimony and exhibits, in opposition to defendants' motion. The following facts, as gleaned from the affidavit are, of course, accepted as true for purposes of this motion. *See* Fed. R.Civ.P. 56(b); *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 444–45 (2d Cir.1980).

Doria was employed by CRM, an investment management firm, for approximately ten years, beginning around 1985. During that time, she asserts that she was supervised primarily by Cramer and McGlynn and answered to them, as well as Edward J. Rosenthal, the third individual defendant. For a portion of the ten years she was a Vice President and head of the Operations Department. Doria alleges that for three or four years prior to August 1994, she was also "acting CFO (Chief Financial Officer)" of CRM. Defendant Rosenthal has conceded that Doria "acted as chief financial officer" in her last three or four years with CRM.[2]

In August 1994, CRM hired Eugene Trainor III ("Trainor") as CFO. Defendants assert that Trainor was hired due to an expansion in CRM's size. At the time Trainor was hired, Doria was 37 years old and Trainor was 31 years old. Trainor was hired at a salary of $110,000, with additional benefits including a salary advance, moving expenses, a loan, and the potential for becoming a CRM shareholder within 18 months. At the time Trainor was hired, Doria's annual salary

---

1. Claims against defendants Jay B. Abramson, Fred Filoon and Arthur J. Pergament were dismissed in their entirety on August 13, 1996, pursuant to stipulation. Title VII claims against Cramer, Rosenthal and McGlynn were also dismissed on August 13, 1996, pursuant to stipula-

tion. *See Tomka v. Seiler Corp.,* 66 F.3d 1295 (2d Cir.1995).

2. See Rosenthal Deposition, May 28, 1996 at 7. Defendants Cramer and McGlynn have not conceded this point.

was $75,000, which reflected a $15,000 increase received in July 1994.

Doria's educational background includes a bachelors degree in accounting from Marymount College and completion of various non-degree industry-related seminars and workshops. Trainor's educational background includes a bachelors degree in economics from the University of Maryland and an M.B.A. in marketing from Loyola College. Trainor also had a CPA license, but was not licensed in New York State as a CPA. Prior to joining CRM, Trainor had experience with two venture capital firms (including CFO experience) and an accounting firm, but did not have experience with an investment management firm, such as CRM.

Doria asserts that she had the experience and skills necessary for the CFO position and that neither Trainor's additional education nor his prior work experience were important for the CFO position at CRM. Doria alleges that she was passed over for the permanent CFO position due to gender and age discrimination and that this discrimination became more severe after Trainor was hired.

Doria alleges that Trainor took over approximately one-half of her previous responsibilities, including banking and accounting relationships, and personnel supervision. In addition to these responsibilities, Trainor took over duties of an outside consultant and the defendants, and was also responsible for supervising Doria.

Beginning a few months after Trainor was hired, Doria asserts that she was "singled out for false criticism by CRM shareholders and Trainor for not appropriately delegating tasks to her subordinates." Doria asserts that at the time in question, her department was understaffed, making it impossible for her to delegate as needed. Doria further asserts that during this time she was called by the defendants to a number of meetings, at which she was criticized for failing to cooperate with Trainor and threatened with dismissal. In or about December 1994, Trai-

nor suggested to Cramer and McGlynn that Doria be fired.

In December 1994, Doria was told that she would not receive a year-end bonus, though she had received such bonuses in 1991, 1992, and 1993. Doria asserts that she was told that the reason she was not receiving a year-end bonus was that she was "not getting along with Trainor." CRM asserts that Doria did not receive a year-end bonus in 1994 due to poor work performance and that she was told that if her performance improved, she would receive a bonus in the future.

In January 1995, Doria filed a complaint against CRM with the EEOC alleging gender-based discrimination and retaliatory discrimination.[3]

In February 1995, Doria received a year-end bonus (for 1994) of $6,500. Doria asserts that in 1994 at least four male Vice Presidents received significantly higher bonuses, three of which were in the $20,000 to $35,000 range.

In April 1995, Doria began an eight-week maternity leave, which was followed by a four-week vacation. Trainor and McGlynn concede that during this time, without asking Doria if she was planning to return to work after her maternity leave, they discussed filling Doria's position if she did not return from maternity leave.

During Doria's maternity leave and subsequent vacation, she was asked by Trainor for help in completing employee job performance evaluations. Doria asserts that she received a letter from Trainor on June 8, 1995 asking for input into the performance evaluations and that she provided the input. Trainor alleges that she never provided the help and failed to respond to a number of phone calls and faxes regarding the matter during her leave. Doria disputes receiving a number of these communications and further asserts that she had no responsibility to handle such matters while on leave.

On July 17, 1995, Doria returned to work and, on that same day, received a memoran-

---

3. The allegations of discrimination in the EEO complaint included: being denied a loan in 1989, due to gender; being denied the opportunity to become a CRM shareholder, due to gender; a pattern of gender-based discrimination in salary decisions; excluding women executives from company lunches and other "social type events;" and a general boys' club attitude.

dum from Trainor reprimanding her for failing to respond to his alleged communications and threatening her with disciplinary action and dismissal. On July 17, 1995, Doria resigned. Her memorandum of resignation stated, "In light of your continuing discrimination against me in the workplace, I can no longer work here. Under the circumstances I am unwillingly submitting my resignation effective immediately. I would have preferred to remain in your employ, but unfortunately found the working conditions intolerable."

On April 18, 1996, Doria filed this lawsuit alleging that defendants: 1) failed to pay her an "equal wage" for "equal work," due to her gender and age; 2) denied (or postponed granting) her a year-end bonus in 1994, due to her gender and age; 3) denied her the opportunity to become a shareholder, due to her gender; 4) engaged in a practice of paying female employees less than male employees; 5) denied her a loan, due to her gender; 6) excluded her and other female employees from company-related social events; 7) threatened her with dismissal and generally treated her in a hostile and degrading manner, due to her gender; 8) made demands on her, based on her gender, which were not made on similarly-situated male employees; and 9) engaged in a pattern of discrimination and harassment in retaliation to her having filed a complaint with the EEOC.

## LEGAL STANDARD

A motion for summary judgment must be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see H.L. Hayden Co. v. Siemens Medical Systems, Inc., 879 F.2d 1005, 1011 (2d Cir.1989). It is the burden of the moving party to demonstrate initially the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986); see also Gallo v. Prudential Residential Servs. Ltd., 22 F.3d 1219, 1223 (2d Cir.1994). The burden then shifts to the nonmoving

party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Affidavits in support or opposition of a summary judgment motion must be made on personal knowledge, setting forth facts which would be admissible at trial by an affiant who is competent to testify to the matters within the affidavit. Fed.R.Civ.P. 56(e). A showing that there is a genuine issue of fact for trial requires a showing sufficient to establish the existence of every element essential to the party's case, and on every element for which the party will bear the burden of proof at trial. An issue of fact is "genuine" if "a fair minded jury could return a verdict for the plaintiff on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In deciding whether there is a genuine issue for trial, "the court is required to draw all factual inferences in favor of the party against whom summary judgment is sought." Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir.1989). Where the nonmovant's evidence is merely conclusory, speculative or not significantly probative, summary judgment should be granted. Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12–15 (2d Cir.1986), cert. denied, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

## EQUAL PAY ACT CLAIM

To establish a *prima facie* case under the Equal Pay Act ("EPA"), a plaintiff must demonstrate: "i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions." Tomka v. Seiler Corp., 66 F.3d 1295, 1310 (2d Cir.1995) (citations omitted); see also Aldrich v. Randolph Central School District, 963 F.2d 520, 524 (2d Cir.), cert. denied, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). Once a *prima facie* case has been established, the burden shifts to the defendant to prove that the wage difference is justified by one of four affirmative defenses: "i) a merit system; ii) a seniority system; iii) a system which measures earnings by quantity or quality of production; iv) a differential based on any other

factor other than sex." *Tomka*, 66 F.3d at 1310 (citations omitted). If a defendant relies on the fourth affirmative defense (factor other than sex), he or she must also prove that this factor has a legitimate business purpose. *Id.; Aldrich*, 963 F.2d at 526–27.

As the first and third elements of a *prima facie* EPA claim are met in this case, the differences between the parties concern the second element—"equal work." Doria's contention is that the responsibilities of her position before Trainor was hired and the responsibilities of Trainor's position are "equal work" for purposes of the EPA. Doria concedes that she and Trainor did not have identical responsibilities. Doria submits that Trainor's responsibilities included "approximately fifty percent" of Doria's former responsibilities, and that this fifty percent included: 1. conducting banking relationships; 2. conducting accounting relationships; 3. supervising personnel; 4. providing information to the outside accountant to assist with the preparation of CRM's tax returns and tax planning; 5. overseeing internal accounting; 6. overseeing CRM's budgetary process; 7. administering payroll and benefit plans; and 8. overseeing CRM's cash management.

■ Leaving aside the question of whether Doria was ever "acting CFO," defendants assert that Trainor took on a number of responsibilities not previously assigned to Doria, including responsibilities previously performed by Warren Wang, an outside consultant, a number of responsibilities previously performed by Cramer, Rosenthal or McGlynn, and the supervision of Doria. The work taken over from Mr. Wang was responsibility for all of the financial accounting for two hedge funds managed by CRM, including the posting of trades, booking of operating activity, calculation of management fees, allocation of gains and losses, and creation of financial statements and partners' capital

schemes. In 1994, Mr. Wang was paid $54,700 by CRM and in 1995 he was paid $39,500. The work taken over from McGlynn included responsibility for CRM's leasing activity and operations.

■ Though identical work is not required to establish a *prima facie* case under the EPA, substantially equal work is. *See Tomka*, 66 F.3d at 1310; *Usery v. Columbia Univ.*, 568 F.2d 953, 958 (2d Cir.1977). Significantly, Doria admits that only one half of her former job responsibilities were taken over by Trainor. Even if fifty percent of Doria's responsibilities were transferred to Trainor, the additional responsibilities he was given are sufficient to establish that he and Doria did not perform "equal work" for purposes of the EPA.[4] *See Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974); *Aldrich*, 963 F.2d at 524. Here, it is clear that the jobs were not equal. At the very least, the positions differed significantly in that Trainor took on the work previously done by Warren Wang and some of McGlynn's work.

■ The case law makes clear that Doria and Trainor's jobs were not equal work for purposes of the Equal Pay Act. When the additional tasks of one job in comparison to another job are substantial, the jobs are not congruent and the work is not equal. *See Lambert v. Genesee Hospital*, 10 F.3d 46, 56 (2d Cir.1993), *cert. denied,* ── U.S. ──, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994); *Usery*, 568 F.2d at 959. Defendants' motion for summary judgment on claims under the EPA is granted.[5]

## TITLE VII CLAIMS

Doria asserts two bases for relief under Title VII: gender-based discrimination and retaliatory discrimination.[6] As proof of dis-

---

**4.** Defendants assert that as Trainor supervised Doria, their jobs could not be "equal work" for purposes of the EPA. *See Burger v. Health Ins. Plan of Greater New York*, 684 F.Supp. 46, 49 (S.D.N.Y.1988). This Court is not persuaded by the formalistic approach suggested by defendants as its application allows employers to bypass their obligations under the EPA simply by creating false "supervisory" positions.

**5.** As Doria has failed to make out a *prima facie* violation of the Equal Pay Act, the merits of defendants' affirmative defense will not be addressed.

**6.** Doria's age discrimination is brought under the New York State Executive Law § 296 exclusively. As jurisdiction for this claim is pendent to federal claims upon which summary judgment is being granted, this Court will no longer exercise

crimination is in most instances circumstantial, courts have developed a three-step procedure to allocate the burden of proof. First, the plaintiff must establish a *prima facie* case; second, if a *prima facie* case is established, the defendant has the burden of articulating a legitimate non-discriminatory reason for its acts; third, if a legitimate non-discriminatory reasons has been articulated, the plaintiff has the opportunity to demonstrate, by a preponderance of the evidence, that the legitimate reason proffered by the defendant is a pretext for discrimination. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

In the Title VII context, to defeat a motion for summary judgment, the nonmoving party is required to produce "not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason....'" *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir.1996) (quoting *Woroski v. Nashua Corp.,* 31 F.3d 105, 110 (2d Cir. 1994)) (citations omitted).

### A. Retaliatory Discrimination

A *prima facie* case of retaliation under Title VII requires the plaintiff to show: "1) participation in a protected activity known to the defendant; 2) an employment action disadvantaging the plaintiff; and 3) a causal connection between the protected activity and the adverse employment action." *Tomka,* 66 F.3d at 1308; *see also Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 64 (2d Cir.1992). Once this showing is made, the defendant "must demonstrate legitimate reasons for its actions, whereupon the plaintiff bears the burden of showing that the defendant's explanations are pretext for

the true discriminatory motive." *Van Zant,* 80 F.3d at 714 (citations omitted).

▉ The first element of a retaliation claim is engaging in a protected activity known to the employer. Doria asserts two protected activities: 1) filing a complaint with the EEOC, which occurred on January 10, 1995, and 2) informal complaints about her treatment at CRM.[7] In this case, the two different protected activities require different analyses and will therefore be dealt with separately.

#### 1. EEO Complaint

In order to make out a *prima facie* retaliation claim, a causal connection between the protected activity and the adverse employment action must be established. *See Choudhury v. Polytechnic Institute of New York,* 735 F.2d 38, 44 (2d Cir.1984). Here, the majority of the discriminatory acts which Doria alleges were taken in response to her EEO complaint took place *prior* to January 1995, and therefore could not have been retaliatory. For instance, the problems with the year-end bonus began in December 1994, when Doria was told that she would not receive a bonus at that time (she did eventually receive a bonus in February 1995); Trainor was hired for the CFO position in August 1994; Doria was denied a loan in 1989; and Doria had not been given the opportunity to become a CRM shareholder for many years prior to 1995. As all of these activities occurred prior to the time Doria made her EEO complaint, the "causal connection" requirement inherent in a retaliation claim has not been met with respect to the activities listed above. *See Choudhury,* 735 F.2d at 44; *Chojar v. Levitt,* 773 F.Supp. 645, 645 (S.D.N.Y.1991)

The only allegedly discriminatory activities which took place *after* the EEO complaint was made were: 1. being reprimanded (in the form of a February 16, 1995 memorandum) for problems with a computer run; and

jurisdiction over the state law age discrimination claim. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

7. In order to assert a retaliation claim, the protected activity need not be a formal charge of

discrimination. Informal complaints to management of discrimination are also "protected." *See Sumner v. U.S. Postal Service,* 899 F.2d 203, 209 (2d Cir.1990).

2. being subjected to generalized harassment and hostility. CRM characterizes the February 16, 1995 memorandum as appropriate work-related criticism and denies that Doria was subjected to "harassment and hostility."

First, the February 16, 1995 memorandum addresses a specific problem—the "January Computer Run." Doria concedes that the computer run was not finished in a timely fashion. Therefore, the memo is appropriately characterized as legitimate work-related criticism. Doria has put forward no evidence which would allow a reasonable factfinder to conclude that the defendant's characterization of the memorandum is pretext for a discriminatory motive, therefore this action cannot be the basis for a retaliation claim. *See Van Zant*, 80 F.3d at 714.

Second, CRM denies any generalized harassment and asserts that any acts which Doria interpreted as harassing or hostile were actually legitimate work-related criticisms. In addition to the February 1995 memo discussed above, the only instance pleaded with appropriate specificity, *see Knight*, 804 F.2d at 12–15, of allegedly harassing or hostile behavior exhibited by any of the defendants was a phone conversation with Pergament in which, Doria alleges, Pergament swore at her. Doria asserts that she told McGlynn about Pergament's "derogatory" behavior and he told her to "deal with it." Doria herself concedes that she does not know when the phone conversation with Pergament took place, making it impossible to evaluate if this incident could have been retaliatory in nature. Having failed to demonstrate a causal connection between the protected activity and the Pergament incident, the incident cannot be the basis for a retaliation claim. *See Tomka*, 66 F.3d at 1308; *Choudhury*, 735 F.2d at 44.

### 2. *Informal Complaints*

■ Doria asserts that she made repeated complaints of discrimination to Pergament's personal assistant, Camille Parisi, prior to the time she filed her EEO complaint. Yet,

Doria fails to put forth evidence that Pergament or any of the defendants knew or should have known of these complaints simply because they were made to Ms. Parisi.[8] Therefore, Doria has failed to demonstrate through deposition testimony, affidavits or any other acceptable procedures that she engaged in a protected activity "known to the defendants." The case law makes clear that the employer's knowledge of the protected activity is necessary to establish a *prima facie* retaliation claim. *See Sumner v. U.S. Postal Service*, 899 F.2d, 203, 209 (2d Cir. 1990); *Tomka*, 66 F.3d at 1308.

As Doria has failed to show, with respect to the EEO complaint, a causal connection between the protected activity and the adverse employment actions, or, with respect to the informal complaints, that defendants were aware that she engaged in a protected activity, defendants' motion for summary judgment on the issue of retaliatory discrimination is granted.

### B. Gender–Based Discrimination

Doria asserts a number of facts in support of her Title VII gender-based discrimination claim, each of which will be dealt with in turn.

■ 1. Doria asserts that gender-based discrimination is evidenced by the fact that Trainor was hired as CFO and at a salary significantly higher than hers. She says that Trainor received a starting salary of $110,-000, and received additional money for moving expenses, certain living expenses and was guaranteed a bonus of $25,000 after one year with CRM, while she received only an annual salary of $75,000.

Defendants put forth, as the non-discriminatory motivation for this hiring/salary action, that Trainor was hired for the CFO position due to his education, experience and other intangible qualities. In response, Doria asserts that Trainor's education and experience were not necessary to the CFO position. Specifically, she asserts that his prior

---

8. Doria also fails to state when these communications took place. Therefore, this Court is unable to evaluate whether, if these communications were known to defendants, there was a causal connection between these complaints and any adverse employment actions. *See Choudhury*, 735 F.2d at 44.

work experience was not relevant as the experience was with a venture capital firm, not an investment management firm and that his CPA licensing was not relevant as he was not licensed as a CPA for practice in New York. Doria does not address the relevance of Trainor having earned an MBA.

Though education and experience can be appropriate criteria upon which to base an employment decision, *see Pantchenko v. C.B. Dolge Co., Inc.,* 581 F.2d 1052, 1054 (2d Cir.1978), whether Trainor's additional experience and education were properly considered with respect to the CFO position is an issue of material fact. Therefore, defendants' motion for summary judgment is denied on this issue.

■■■ 2. Doria asserts that CRM refused to grant her a loan while male CRM employees were granted loans. In 1989, Doria had requested an advance on her year-end bonus as a loan to help her purchase a house. That request was denied. At approximately the same time, Doria asserts, a male employee, Kevin Chin, was given a loan by CRM so that he could buy stock. Doria also asserts that another male employee, Brad Bruce, was given a loan by CRM.

In response to Doria's assertion that CRM has a pattern of gender-based discrimination in granting loans to employees, defendants put forth the non-discriminatory explanation that CRM has a general policy against loaning money to employees, that it has made exceptions to the policy, including at least one loan made to a female employee, Kathie Roshay. Doria has not responded to this explanation beyond re-asserting her original allegation and therefore has failed to come forward with admissible facts such that a rational fact-finder could conclude that CRM's explanation was false and the more likely reason for the actions was discrimination. *See Van Zant,* 80 F.3d at 714; *Woroski,* 31 F.3d at 110. Moreover, Doria concedes that at a later time, she was offered a loan, but declined it as she had already taken the money she needed from her pension plan. *See* Doria Deposition, May 21, 1996 at 98. Of the three loans discussed by the parties, two were given to men and one was given to a women. This pattern, without further evidence, is insufficient to support an allegation of gender-based discrimination. Therefore, defendants' motion for summary judgment is granted on this issue.

■■ 3. Doria asserts that CRM maintained a policy of paying male Vice Presidents more than female Vice Presidents. Specifically, Doria asserts that she was one of two female Vice Presidents, and both she and the other female Vice President were paid less than any of the male Vice Presidents.

Defendants deny this allegation and state that salary decisions are based on a number of factors, including education, skills, and experience. In relying on "education, skills, and experience" in the abstract without demonstrating how these criteria are applied to CRM Vice Presidents, defendants have failed to meet their burden of establishing a legitimate non-discriminatory reason for their acts. The pattern of salary disparity asserted by Doria is sufficient to allow a rational fact finder to conclude that the reason proffered by the defendants is false. *See Van Zant,* 80 F.3d at 714. Standing alone, defendants' explanation is insufficient to demonstrate the absence of a genuine issue of material fact. *See Celotex,* 477 U.S. 317 at 323–25, 106 S.Ct. 2548, 2552–54. Therefore, defendants' motion for summary judgment is denied on this issue.

■■ 4. Doria asserts that only male employees were given the opportunity to purchase shares in CRM. Defendants, through their deposition testimony, assert only that there has never been a female shareholder at CRM. As defendants have failed to come forward with any non-discriminatory explanation for this behavior, an issue of material fact remains and accordingly defendants' motion for summary judgment is denied on this issue. *See Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10 (1986); *Van Zant,* 80 F.3d at 714.

■■ 5. Doria asserts that she was expected to work during her maternity leave (and subsequent vacation), yet male CRM employees were not expected to work during their vacations. Defendant have failed to put

forth any nondiscriminatory explanation for this allegedly discriminatory behavior. Therefore, defendants' motion for summary judgment is denied on this issue. *Van Zant,* 80 F.3d at 714.

■ 6. Doria asserts that when problems arose during her working relationship with Trainor, she alone was called to meetings to discuss the problems and was threatened with dismissal. Defendants put forward the non-discriminatory explanation that they viewed the problems between Doria and Trainor as being due to Doria's behavior and attitude and therefore they thought it would have been inappropriate to invite Trainor to these meetings. The explanation given by the defendants is consistent with a genuine work-related decision [9] and is a legitimate non-discriminatory reason for the action. Doria has failed to come forward with any evidence which would support a finding by a rational fact finder that the reason asserted by the defendants is false and pretext for discrimination. Therefore, defendants' motion for summary judgment is granted on this issue. *See id.*

■ 7. Doria asserts that female CRM employees were excluded from company-related social events, such as company lunches and golf and tennis outings. As the defendants have failed to put forth a non-discriminatory explanation for these actions, an issue of material fact remains and defendants' motion for summary judgment is denied on this issue.

■ 8. Doria asserts that she was subjected to harassing and discriminatory conduct, including "rude," "nasty" and "derogatory" comments and behavior directed towards her.[10] Defendants characterize the conduct as appropriate work-related criticism. In response, Doria asserts that such conduct was exhibited only towards women

at CRM and cites herself and one of the female secretaries as among those people who were treated in this fashion. As fact issues remain, defendants' motion for summary judgment on this issue is denied.

9. Doria asserts that she was denied a 1994 year-end bonus, when male CRM employees received year-end bonuses. Yet, Doria concedes that she was told in December 1994 that she would not receive a bonus due to problems with her work attitude and performance, but that if things improved she would receive a bonus at a later time. Doria did receive a bonus in February 1995.

As Doria did receive a bonus (though later than she had expected), she has failed to plead sufficient evidentiary facts to support this contention. Therefore defendants' motion for summary judgment on this issue is granted.

■ 10. Doria asserts that female CRM employees received lower year-end bonuses than male CRM employees. Specifically, Doria alleges that in 1994, four male Vice Presidents (Chin, Prober, Zech and Geller) received bonuses significantly higher than her bonus of $6,500, and three of the male Vice Presidents received bonuses in the $20,000 to $35,000 range. Defendants deny this allegation generally, but do not dispute the figures cited by Doria. Additionally, defendants put forward the non-discriminatory explanation that bonuses are merit-based. As the defendants have failed to show the nexus between their non-discriminatory explanation of a merit system for awarding bonuses and the actual bonuses received by the CRM employees discussed above, an issue of material fact remains. *See supra* p. 21. Accordingly, defendants' motion for summary judgment is denied on this issue.

■ 11. Doria asserts that she was, due to her gender, forced to resign. Con-

---

**9.** Title VII is not of course a vehicle for substituting the judgment of a court for the judgment of an employer. *See Jiminez v. Mary Washington College,* 57 F.3d 369, 377 (4th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 380, 133 L.Ed.2d 304 (1995).

**10.** Similar underlying facts were dealt with with respect to retaliatory discrimination. *See supra*

p. 17. Summary judgment was granted with respect to this issue on the retaliation claim as there was insufficient evidence of a causal connection between the protected activity and adverse employment action. Such causality is not part of a Title VII gender-based discrimination claim.

structive discharge occurs when the employer intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996); *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir.1983). A work atmosphere is intolerable when a reasonable person in the employee's shoes would have felt compelled to resign. *Chertkova*, 92 F.3d at 88 (citations omitted). A constructive discharge will have occurred only when the employer "'*deliberately* makes an employee's working condition so intolerable that the employee is forced into an involuntary resignation.'" *Spence v. Maryland Casualty Co.*, 995 F.2d 1147, 1156 (2d Cir.1993) (citations omitted) (emphasis added). The case law makes clear that the test is not whether an employee's working conditions were difficult or unpleasant. *Id.* at 1156; *Stetson v. NYNEX Service Co.*, 995 F.2d 355, 360 (2d Cir.1993). In addition, a change in work responsibilities, such as the one Doria experienced, when there is no loss of pay or change in job title, is insufficient to establish constructive discharge. *Id.* The most common constructive discharge case involves veiled or direct threats that failure to resign will result in discharge.[11] *See Spence*, 995 F.2d at 1150; *Stetson*, 995 F.2d at 359.

Doria has not put forth evidence sufficient to support a claim of constructive discharge. The complaints by defendants and Trainor about her work made the environment, at most, difficult or unpleasant. *See Spence*, 995 F.2d at 1156. The changes in her responsibilities once Trainor joined CRM were not accompanied by a decrease in salary or change in job title.[12] *See Stetson*, 995 F.2d at 360. There were instances in which Doria was told that if her performance in certain areas, such as the February 1995 computer run and the alleged failure to provide input into employee performance evaluations, did not improve, she might be terminated. But, when criticisms are both concrete and appropriately work-related, they will not give rise to a claim of constructive discharge. *See Spence*, 995 F.2d at 1157. Doria does assert that there were times when she was threatened with dismissal and that there was discussion about her possible termination. Doria alleges that in December 1994 Trainor suggested to Cramer and McGlynn that Doria be fired. In Trainor's July 17, 1995 memorandum to Doria, he threatened dismissal and Doria asserts that there had been threats of dismissal in December 1994. In addition, Doria asserts that during her maternity leave Trainor and McGlynn discussed filling her position if she did not return from leave. Yet, none of these instances, even when taken together (*see Chertkova*, 92 F.3d at 90) are sufficient to create an "intolerable" work environment such that a reasonable person in the Doria's shoes would have felt compelled to resign. *See id.* at 88. The threats of dismissal that allegedly occurred in December 1994 were related to problems in Doria's work performance, and legitimate complaints about work performance are not the type of deliberate actions on the part of a employer which create an "intolerable" work environment for constructive discharge purposes. *See Spence*, 995 F.2d at 1157. With respect to the conversations which allegedly took place between Trainor, McGlynn and Cramer, and Trainor and McGlynn, Doria has not pleaded that she knew of these conversations prior to resigning. Without knowledge of the conversations, Doria could not have felt that the defendants deliberately created an environment so intolerable such that a reasonable person would have felt compelled to resign. *Id.* Accordingly, defendants' motion for summary judgment is granted on the issue of constructive discharge.

---

**11.** In deposition testimony, Doria asserts that at some point after Trainor was hired she was told by the defendants, "This is the way it is. Deal with it, or you can leave. And if you're unhappy, you can leave." Doria Deposition, May 21, 1996 at 199–200. Such a comment did not rise to the level of threat, as there was no suggestion that if she did not voluntarily resign she would be discharged. *See Stetson*, 995 F.2d at 359.

**12.** Doria has asserted that her job title was changed in that, prior to Trainor being hired as CFO, she had been CFO. At best, she was "acting CFO," which is, by definition, not a permanent job title. *See Rosenthal Deposition*, May 28, 1996 at 7.

Further, defendants' motion for summary judgment is granted with respect to state law claims under N.Y.Exec.Law § 296 *et seq.* brought pendent to those federal claims of retaliatory discrimination and gender-based discrimination under Title VII upon which defendants' motion for summary judgment has been granted. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Rodriguez v. Phillips*, 66 F.3d 470, 482–83 (2d Cir.1995).

Further, defendants' request for costs and disbursements is denied.

SO ORDERED.