**Samuel LEW, Plaintiff,**

v.

**RADIATION DYNAMICS, INC., Defendant.**

**No. CV 95–2441(ADS).**

United States District Court, E.D. New York.

Feb. 14, 1998.

Samuel Lew, Roslyn Heights, NY, pro se.

Ross & Hardies, New York, NY, by Michael J. DiMattia, Catherine A. Rogers, of counsel, for defendant.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The plaintiff, Samuel Lew ("Lew" or the "plaintiff") brings this action against his former employer, the defendant Radiation Dynamics, Inc. ("RDI" or the "defendant"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, for alleged discrimination on the basis of his French national origin and retaliatory discharge. Presently before the Court is the defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56").

### I. BACKGROUND

The facts set forth below are taken from the Complaint and the motion papers submitted by the parties. RDI is in the business of manufacturing and servicing machines known as electron beam particle accelerator systems (the "electron beam machines"). These machines apparently emit an electron beam which is "supercharged" with high levels of electricity. This electricity enables the electron beam particle accelerator to transform the molecular structure of various substances. Two of the by-products of this process are ozone and radiation. Due to concern for the release of these by-products into the environment, great care in the maintenance of these machines must be taken. Because each of these machines is worth approximately $3 to $5 million, with only two of

RDI's approximately 250 customers owning backup machines, and the customer unable to manufacture its products while the machine is out of service, great pressure is placed on RDI by the customer to repair the machines when they malfunction. The machines are used by, and located at, RDI's customer facilities located throughout the United States and the world including France, Switzerland, Canada, Germany, Italy, Korea, Taiwan and China.

Lew is a naturalized American citizen whose country of origin is France. He speaks English with a French accent. Sometime prior to June 14, 1993, he was interviewed for the position of field service technician by Edward Markey ("Markey"), RDI's Manager of Customer Engineering. A field service technician is responsible for the proper service of the electron beam machines at RDI's customers' facilities. On June 14, 1993, Lew, along with Thomas Canavan ("Tom" or "Canavan"), Ronald Pyne ("Ron" or "Pyne"), James Scheid ("Jim" or "Scheid") and Gerald White ("Jerry" or "White"), were hired by RDI. The parties disagree as to whether these five employees were hired as field service technicians or as field service technician interns. According to the defendant, these five employees were to be probationary employees for the first six months. Approximately one month later, Pyne was injured in an automobile accident and dropped out of the program.

In July 1993, RDI administered a written test entitled "Dynamitron Quiz" to these newly hired employees. This test was graded by Raymond Loby ("Loby"), an RDI supervisor who provided the most classroom training and who passed away in January 1994. According to the defendant, Lew received the lowest score of "poor." However, according to the defendant, the employees were not informed of their scores because RDI did not want to discourage anyone who received a low grade so early in the training period.

On August 2, 1993, Loby evaluated the four employees on their "vault training" as follows:

TOM—FOLLOWER

CANNOT SOLDER, WEAK MECHANICALLY,

VERY WEAK ON SCHEMATICS

CHECK ON SPARK GAPS? WITH WHAT, A.P.S.

HOW DO YOU SET THEM LACKS WILLINGNESS TO LEARN.

JERRY—WEAK, BUT HAS ABILITY TO LEARN.

NOT BAD MECHANICALLY.

RON—GOOD, STUDIES, ASKS KNOWLEDGABLE [sic] QUESTION

SAM—CANNOT GRASP THE SYSTEM, ASKS WRONG

QUESTIONS AFTER I EXPLAIN.

DOES NOT SEEM INTERESTED TO LEARN.

NOT AGILE ENOUGH

COMMENTS LIKE TRYING TO IMPRESS, (LIKE P.T. BARNUM)

JIM—SEEMS GOOD, GOOD WORKER.

(Pl.'s Opp., Ex. 8.)

Between August 23, 1993 and October 8, 1993, RDI sent Lew with Senior Technician Henry Kowalski ("Kowalski"), to one of its clients, Himont Canada, Inc. ("Himont"), in Quebec, Canada, to help repair an RDI machine. The plaintiff maintains that one of the reasons he was selected for this assignment was because he could speak French fluently.

The defendant contends that Kowalski was dissatisfied with Lew's performance because he did not possess a positive work attitude, he often disappeared when work had to be done, and he did not seem interested or willing to learn how to do the work. The defendant contends that Kowalski witnessed Lew criticizing RDI's machine to Himont employees after it malfunctioned. The defendant further maintains that Lew had problems working with Himont employees and made lengthy telephone calls during his shift. On October 14, 1993, the defendant contends that Luciano Paoloni ("Paoloni"), an executive at Himont, advised Richard Galloway, RDI's Manager of Systems Engineering, that Himont employees refused to work with Lew and demanded that Lew never be sent back to Himont. The defendant further contends that Paoloni complained that Hi-

mont employees had difficulty working with Lew and that Lew gave them improper instructions about how to operate the machine.

On October 15, 1993, Markey completed 90 Day Employee Evaluations of the four employees. Lew received an overall evaluation of "unsatisfactory." In answer to whether Lew should be retained, Markey checked the space between "yes" and "no." In response to the question "[i]f no, why should he or she be released," Markey wrote as follows:

Borderline—need extensive evaluation

Try to help him improve

Have received customer complaint (customer requested that he not be sent back)

Postpone decision until after evaluation

(Pl.'s Opp., Ex. 10.) Lew was the only one of the four employees who received an overall evaluation of "unsatisfactory." White, Scheid, and Canavan received an overall evaluation of "average job." However, as to whether Canavan should be retained, Markey responded with a "?" marked under "Yes."

An incident occurred on October 22, 1993. On that date, Lew answered the telephone at RDI. The caller stated that he "wanted to talk to someone who speaks English." (Notice of Mot., Ex. A.) The caller further stated that he was attempting to locate Tony Chliek. According to Lew, when he informed the caller that he was unable to find Chliek, the caller stated that he felt as if he was in a foreign country. When Lew inquired as to the identity of the caller, the caller identified himself as Markey and then hung up.

In response to this telephone conversation, Lew wrote a letter dated October 24, 1993 to Romualdina Guardino ("Guardino"), the Manager of Human Resources, informing her of this incident. He expressed his concern over the fact that the person who made the comment, is also his direct supervisor. Guardino informed Bernard Kestler ("Kestler"), the President of RDI, of Lew's letter. On or about November 10, 1993, a meeting was held with Kestler, Ed Lawrence, the Operations Manager, Guardino, Lew and Markey, to discuss the incident. The parties disagree as to the what occurred at this meeting.

Lew alleges that Kestler expressed anger at him because he made his complaint in writing rather than verbally. (Pl.'s Opp. at 2.) Lew further alleges that Markey never apologized for his remarks. *Id.* On the other hand, RDI contends that Markey did apologize at the meeting, explained that his remark was an attempt at bad humor, and considered the matter closed. (Markey Aff. ¶ 22.)

On November 18 and 19, 1993, RDI administered a final examination to the four new employees. Each exam was graded by Markey and Rick Galloway ("Galloway"). Markey gave Lew a grade of 46.54% and Galloway gave him an even lower grade of 42%. In the narrative evaluation, Markey wrote as follows:

SAM has 6 weeks of field experience and I do not feel he utilized the time as well as he could have to learn more about the machine.

(Pl.'s Opp., Ex. 12.) Galloway wrote the following about Lew:

When he doesnt [sic] know tries to snow you. Has been exposed to field work and does not seem that he has gained from that opportunity.

(*Id.*) Each of the other three employees received higher scores from Markey and Galloway: Canavan received 54.6% and 61%, respectively; Scheid received 77.1% and 84%, respectively; White received 53.6% and 58%, respectively.

According to the defendant, on November 22, 1993, Kestler, Markey and Galloway held a conference to review the four employees' overall performance, including the results of the latter examination. During the conference, they determined that Lew's grade of below 50% was simply unacceptable. They agreed that the machines were potentially too dangerous to permit Lew to service the machines.

On November 24, 1993, Markey completed a 6–Month Employee Evaluation on Lew. Markey gave Lew an overall evaluation of "unsatisfactory." He recommended that Lew should not be retained as an employee, making the following comments:

Performed poorly on 5 month exam

Created customer problems

Made no effort to become a [t]eam member of field svce.

(Pl.'s Opp., Ex. 14 at 4.) Guardino, Ed Lawrence ("Lawrence"), the Operations Manager and Kestler concurred in Markey's evaluation of Lew.

On the same day, November 24, 1993, Lew was terminated from his employment at RDI. On or about February 1, 1994, Lew filed a charge of discrimination against RDI with the Equal Employment Opportunity Commission ("EEOC"). Lew received a right to sue letter dated May 31, 1995. On June 15, 1995, Lew commenced the present action.

## II. DISCUSSION

### A. Standard of review

#### 1. Self representation

In addressing the defendant's motion, the Court is mindful that the plaintiff is proceeding *pro se* and that his submissions "must be 'liberally construed' in favor of the plaintiff[ ] and held to 'less stringent standards than formal pleadings drafted by lawyers.'" *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (per curiam) (citing *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)); *see also Ferran v. Town of Nassau,* 11 F.3d 21, 22 (2d Cir. 1993). The Court recognizes that it must make reasonable allowances so that a *pro se* plaintiff does not forfeit his rights by virtue of his lack of legal training. *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). But the Court is also aware that *pro se* status " 'does not exempt a party from compliance with relevant rules of procedural and substantive law.'" *Id.* (quoting *Birl v. Estelle,* 660 F.2d 592, 593 (5th Cir.1981)).

In this regard the Court notes that Lew's papers submitted in opposition to the defendant's motion are clear, well written and comprehensible.

#### 2. Summary judgment standard

A court may grant summary judgement only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact,

*Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir. 1996), and the movant is entitled to judgment as a matter of law. *See also* Fed.R.Civ.P. 56(c) (setting forth summary judgment standard). However, the Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion. *See Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995); *Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 (2d Cir.1990); *W.A. Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11–12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

According to the Second Circuit, "[s]ummary judgment is a tool to winnow out from the trial calendar those cases whose facts predestine them to result in a direct verdict." *United Nat'l Ins. Co. v. Tunnel, Inc.,* 988 F.2d 351, 355 (2d Cir.1993). Once a party moves for summary judgement, the non-movant must come forward with specific facts showing that a genuine issue exists to avoid the motion being granted. *West–Fair Elec. Contractors v. Aetna Cas. & Surety Co.,* 78 F.3d 61, 63 (2d Cir.1996); *see also Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (quoting Fed.R.Civ.P. 56(e)). "A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see also Vann v. New York City,* 72 F.3d 1040, 1049 (2d Cir.1995).

However, mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 129 (2d Cir.1996); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). Finally, the Court is charged with the function of "issue-finding," not "issue resolution." *Gallo v. Prudential Residential Services, Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994).

The general principles underlying a motion for summary judgment apply no less to this

action simply because it is an employment discrimination case. While caution is to be exercised in granting summary judgment where intent and state of mind is in issue, *Gallo,* 22 F.3d at 1224, summary judgment remains available where no genuine issue exists as to a material fact, *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 40 (2d Cir.1994). For a plaintiff in a discrimination case to survive a motion for summary judgment, the plaintiff must offer "concrete particulars" to substantiate the claim. *Meiri v. Dacon,* 759 F.2d 989 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

It is within this framework that the Court addresses the grounds for the present summary judgment.

B. *National origin discrimination claim*

1. *Exhaustion*

 The defendant contends that the plaintiff's national origin discrimination claim is procedurally defective because Lew failed to satisfy Title VII's prerequisite of first filing such claim with the EEOC. In Title VII cases, a district court only has jurisdiction over those claims included in the EEOC charge or those that are "reasonably related" to the allegations in the plaintiff's EEOC charge. *Butts v. City of New York Dep't of Hous. Preservation & Dev.,* 990 F.2d 1397, 1401 (2d Cir.1993); *Walsh v. National Westminster Bancorp. Inc.,* 921 F.Supp. 168, 171 (S.D.N.Y.1995). The purpose of the exhaustion requirement is to provide notice to the employer and to encourage conciliation and voluntary compliance. *Butts,* 990 F.2d at 1401; *Dargento v. Bally's Holiday Fitness Centers,* 990 F.Supp. 186, 192 (W.D.N.Y. 1997).

In *Butts,* 990 F.2d at 1402–03, the Second Circuit recognized three circumstances which satisfy the reasonable relationship test: (1) conduct within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination; (2) conduct that would constitute retaliation for filing a timely EEOC charge; and (3) further incidents of discrimination perpetrated in precisely the same manner alleged in the EEOC charge.

It is the first exception that is relevant to the present case. This "loose pleading" exception is based on the recognition that EEOC charges are often filed by complainants without the aid of an attorney, and with the primary purpose of alerting the EEOC to the discrimination that a complainant claims to be suffering. *Butts,* 990 F.2d at 1402. Under the standard enunciated above, the relevant inquiry in the present case is whether the EEOC could reasonably be expected to investigate Lew's claim of national origin discrimination, based on the allegations contained in the charge. *See Walsh,* 921 F.Supp. at 172. The Court recognizes, as did the Second Circuit in *Butts,* that the plaintiff was decidedly disadvantaged in filing his EEOC charges because he did not have the benefit of Counsel. After considering the charge in the light most favorable to the plaintiff, the Court finds that it is reasonable to conclude that the EEOC charge would prompt an investigation into discrimination based on national origin. Lew's EEOC charge related the retaliation allegedly taken by RDI against him for reporting the remark that Markey made to him during the telephone conversation. Although Lew checked only the box marked "retaliation," the text of his charge details the telephone incident between Markey and Lew. The plaintiff's EEOC charge contains all the factual allegations necessary for a national origin claim. Indeed, the defendant clearly responded to the allegations of national origin discrimination. A letter dated March 25, 1994 from RDI's attorney to Jose J. Dennid of the EEOC, addressing Lew's EEOC charge, states in relevant part as follows:

> Mr. Lew's charge alleges that his terminations [sic] was pretextural and that the actual basis was his French national origin. He reaches this conclusion because of an alleged incident which occurred on October 22, 1993. It will be clear after reviewing the material provided herein that, national origin played no part in the decision to terminate Mr. Lew.

(Pl.'s Opp., Ex. 4, Letter from Wilsker to Dennid of 3/25/97, at 2.) The letter further states as follows:

It is preposterous to believe that RDI terminated Mr. Lew because of his national origin. Mr. Lew's bilingual capabilities would have been a great benefit to the Company, due to its having accelerators located in French-speaking Quebec and in other French-speaking areas throughout the world. The Company had also expended substantial monies in the training program and desperately needed Technicians who could perform in the field.

Mr. Lew's letter of complaint dated October 24, 1993, indicates clearly that lie does not believe that it is the Company's policy to discriminate based upon national origin....

(*Id.* at 4.) Therefore, the Court finds that the reasonable scope of the EEOC's inquiry encompassed Lew's claim of discrimination based on his French national origin. The Court will now proceed to examine the merits of the plaintiff's national origin claim.

### 2. *Merits of claim*

Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e *et seq.*, makes it an unfair employment practice for an employer to discriminate against any individual with respect to ... the terms and condition of employment because of such individual's race, color, religion, sex, or national origin; or to limit, segregate or classify his employees in ways that would adversely effect any employee because of the employee's race, color, religion, sex, or national origin. *See Fisher v. Vassar College*, 114 F.3d 1332, 1339 (2d Cir.1997) (en banc), *cert. denied,* — U.S. —, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998); *Bridgeport Guardians, Inc. v. City of Bridgeport,* 933 F.2d 1140 (2d Cir.), *cert. denied,* 502 U.S. 924, 112 S.Ct. 337, 116 L.Ed.2d 277 (1991). As the Supreme Court observed in *Griggs v. Duke Power Co.,* 401 U.S. 424, 429–30, 91 S.Ct. 849, 852–53, 28 L.Ed.2d 158 (1971), "[t]he objective of Congress in the enactment of Title VII ... was to achieve equality of employment opportunities and remove barriers that have operated in the past."

The Court examines the plaintiff's allegations of national origin discrimination pursuant to Title VII under the familiar three-step burden shifting analysis developed by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

First, the plaintiff bears the initial burden of proving by the preponderance of the evidence a *prima facie* case of national origin discrimination. Second, if the plaintiff succeeds, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the plaintiff's discharge. Third, should the defendant advance such a reason or reasons, the plaintiff bears the ultimate burden to prove that the legitimate reasons offered by the employer were merely a pretext for intentional national origin discrimination or not the only reason, and that a motivating factor was national origin discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 802–03, 93 S.Ct. at 1825; *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Renz v. Grey Advertising, Inc.,* 135 F.3d 217, 221–22 (2d Cir.1997); *Fields v. New York State Office of Mental Retardation and Developmental Disabilities,* 115 F.3d 116, 121 (2d Cir.1997). The plaintiff may satisfy this latter burden either:

(1) directly, by producing evidence that a discriminatory reason more likely motivated the employer; or

(2) indirectly, by showing that the employer's proffered explanation is unworthy of credence, and that intentional discrimination actually motivated the employer's actions.

*Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). However, mere conclusory allegations of discrimination are insufficient to meet this burden. *Id.* at 998.

In order to establish a *prima facie* case under the facts of this case, the plaintiff must present evidence that:

(1) he is a member of a protected class;

(2) he was qualified for the position in which he worked;

(3) he was subjected to an adverse employment decision; and

(4) that the adverse employment decision occurred in circumstances giving rise to an inference of national origin discrimination.

*Stern v. Trustees of Columbia University in the City of New York,* 131 F.3d 305, 311–12 (2d Cir.1997). In a case such as the present one, where the plaintiff's evidence is entirely circumstantial, the pertinent question is whether the plaintiff's *prima facie* case contains evidence sufficient to permit the trier of fact to draw all inference that national origin discrimination was a substantial factor in the adverse employment decision. *See Burger v. New York Institute of Technology,* 94 F.3d 830, 834 (2d Cir.1996). The threshold of evidence that the plaintiff must proffer to establish a *prima facie* case is low. *de la Cruz v. N.Y. City Human Resources Administration Dep't of Soc. Serv.,* 82 F.3d 16, 20 (2d Cir.1996).

In the present case, the Court finds that the plaintiff has not established a *prima facie* case of discrimination based on his French national origin. Even a liberal view of the plaintiff's papers submitted in opposition to the defendant's motion demonstrates that the plaintiff does not allege that he suffered any adverse employment decisions due to his French national origin. Rather, he maintains that he received negative evaluations and was discharged solely in retaliation for filing his complaint with RDI's Human Resources department. Lew's papers discuss only his retaliation claim. Lew states that he "did not complain that [he] was discharged because of [his] national origin but that [he] was discharged in retaliation for having protested a discriminatory act based on [his] national origin." (Pl.'s Opp. at 15.) His papers are replete with other statements corroborating the Court's understanding that any alleged adverse employment decisions suffered by the plaintiff relates to his retaliation claim. The plaintiff states as follows:

I filed a written complaint about the ethnic slur to the company's personnel Manager at the time, and was retaliated against for filing this complaint by being wrongfully terminated on a performance-based pre-

text. Federal [l]aw prohibits retaliation against persons who have exercised their rights to argue or complain about matters they believe may violate the law.

\* \* \*

Then, the [d]irect [e]vidence, the link and time-frame; the discriminatory-biased remark made to me by my supervisor who was directly involved in the decision-making process and who dismissed me abruptly and with no prior notice.

\* \* \*

That I was fired in retaliation for having complained about a discriminatory act perpetrated to me by my manager while I was on the job and who was directly involved in the decision-making process to dismiss me abruptly.

(Pl.'s Opp. at 17.) The Court finds the plaintiff's papers barren of any argument that he suffered an adverse employment decision as a direct result of RDI's discrimination based on his French national origin. Therefore, the Court grants the defendant's motion for summary judgment pursuant to Rule 56, on the plaintiff's claim of discrimination based on his national origin.

## C. *Retaliation claim*

The distribution and allocation of burdens of proof in a retaliatory discharge case follows the same burden shifting *McDonnell Douglas* analysis. *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1038 (2d Cir.1993). A *prima facie* case of retaliation requires that the plaintiff demonstrate: (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. *Van Zant v. KLM,* 80 F.3d 708, 714 (2d Cir.1996) (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995)): *see also Cosgrove,* 9 F.3d at 1039; *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 64 (2d Cir.1992). Once this showing is made, the defendant "must demonstrate legitimate reasons for its actions, whereupon the plaintiff bears the burden of

showing that the defendants explanations are pretext for the true discriminatory motive," *Doria v. Cramer Rosenthal McGlynn, Inc.,* 942 F.Supp. 937, 943 (S.D.N.Y.1996) (quoting *Van Zant,* 80 F.3d at 714), and that retaliation is a motivating factor in his discharge.

■ Lew has satisfied the first element of his retaliation claim, namely, participation in a protected activity in the form of his letter complaint dated October 24, 1993 addressed to Guardino, RDI's Human Resources manager. This letter was acknowledged by the defendant when RDI held a meeting on or about November 10, 1993 with Kestler, Lawrence, Guardino, Lew and Markey, to discuss the incident. The Second Circuit has held that protected activity in a Title VII case need not be a formal charge of discrimination. *See Sumner v. U.S. Postal Service,* 899 F.2d 203, 209 (2d Cir.1990) (informal complaints to management constituted protected activities within Title VII actions).

The Court further finds that Lew has satisfied the second element of his *prima facie* case. Lew maintains that he suffered adverse performance evaluations and was discharged in retaliation for filing his complaint with RDI.

■ With regard to the final element of the *prima facie* case, Lew asserts the following causal connection between his complaint to RDI and the subsequent negative evaluations and his discharge:

> Then the [d]irect [e]vidence, the link and time-frame; the discriminatory-biased remark made to me by my supervisor who was directly involved in the decision-making process and who dismissed me abruptly and with no prior notice.

(Pl.'s Opp. at 17.) The plaintiff maintains that the temporal proximity between his complaint and his negative performance evaluations and discharge provide the necessary causal link. Lew further maintains that he never received written or verbal notice of the poor evaluations. He insists that his final examination score sheet was "doctored" so that he would not score above 50%. Lew also contends that there was a modification of his examination score sheet to reflect a "*consistently lower* score than the original

score marked on the sheet." (Pl.'s Opp. at 10; Pl.'s Opp., Ex. 12) (emphasis in original). One of the two graders of his final examination was Markey, against whom Lew filed his complaint. Lew further maintains that RDI did not follow its own procedure for termination of its employees. RDI's employee handbook details the procedure to be followed, after the employee's introductory period, before an employee is terminated. (*See* Pl.'s Opp., Ex. 3.) The plaintiff asserts that the introductory period was only a three-month period, while the defendant maintains that it was a six-month period. If the plaintiff is correct that the introductory period for RDI employees is three months, ignorance of its own procedures supports the validity of the plaintiff's *prima facie* case. *See Cosgrove,* 9 F.3d at 1039.

On the other hand, RDI contends that Lew cannot establish a *prima facie* case of retaliation. RDI contends that Lew's position was in jeopardy prior to the alleged incident with Markey and that the final examination merely confirmed its opinion of Lew as a poor employee. RDI cites numerous events that transpired which led to its determination to terminate Lew's employment. First, RDI points to Kowalski and the customer's unfavorable evaluation of Lew after his field assignment at Himont. The customer requested that Lew never be sent back to Himont. Second, RDI contends that Lew received a grade of "poor" on the first examination given in July 1993. Third, in October 1993, Lew received an overall evaluation of "unsatisfactory" from Markey. Fourth, Lew received the lowest score of the four new employees on the final examination administered on November 18 and 19, 1993. The defendant asserts that Markey's isolated remark about Lew's accent is not sufficient evidence to overcome Lew's unsatisfactory performance record.

■ The defendant further contends that even if Lew is able to state a *prima facie* case of retaliation, Lew cannot demonstrate that RDI's decision to terminate him was pretextual given his documented poor performance. RDI states that Lew's bilingual skills would have been a tremendous asset to

RDI, since the company has customers whose employees speak French.

Sorting through all of this, in the Court's opinion, myriad questions of fact exist as to whether RDI's decision to terminate Lew was pretextual. First, Lew contends that he did not do poorly on the examination administered in July 1993, submitting his copy of the examination. (*See* Pl.'s Opp., Ex. 6.) The Court notes that Lew's copy of his examination, in contrast to RDI's copy, does not have the word "poor" written on it. RDI maintains that it did not place a score on the copy returned to the interns because it did not want to discourage its employees, a classic issue of fact. The Court finds that an issue of fact exists as to Lew's true grade on this first examination.

Second, RDI contends that Lew received a negative evaluation from Loby on August 2, 1993. However, the Court notes that Tom received a poor evaluation as well, yet Tom was not terminated. RDI further contends that Lew received an overall 90–day evaluation of "unsatisfactory" from Markey on October 15, 1993. The Court notes that although Canavan received an overall 90–day evaluation of "average," Markey responded with a "?" marked under "Yes" as to whether Canavan should be retained as an employee. In the Court's opinion, a comparison of Lew's evaluation with those of other employees demonstrates that Lew was not the only employee with questionable qualifications yet he was the only one who was terminated.

Third, Lew maintains that his final examination score was altered. RDI explains that the alterations resulted from the grader reviewing the test more than once. (*See* Markey's Reply Aff. ¶ 4.) RDI emphasizes that similar markings were made on other examination sheets. The Court finds that: (1) the grading of Lew's examination and the completion of his 6–month evaluation by the same person against whom Lew's complaint was made; and (2) the determination at the conference held on November 22, 1993, after the final exam was graded and after it was known that Lew received the lowest score, that Lew's grade of below 50% was unacceptable, could be interpreted by a rational jury to support the plaintiff's charge of retaliation

at the hands of his supervisor. Accordingly, for all of the above reasons, the Court denies the defendant's motion for summary judgment on the plaintiff's retaliation claim.

### D. *Damages*

█ RDI maintains that it learned on July 9, 1997, through discovery, that Lew engaged in wrongdoing which would have justified his termination and limit any damages he seeks. On his Employment Application, Lew wrote that he had been terminated from his previous employment as a result of a reduction in force. RDI contends that Lew lied, in violation of RDI's Employee Handbook, on this application because he failed to advise that he was terminated due primarily to poor performance.

Upon a review the Termination Report from Lew's previous employer, the Court finds that an issue of fact exists as to whether Lew actually lied on his Employment Application. The Court notes that the Employment Application does state that Lew was terminated as a result of a reduction in force. However, the report also states that Lew "was not a good engineer" and that they "should have let [him] go months ago but waited for the large layoff." (Notice of Mot., Ex. L.) Therefore, the Court finds that an issue of fact exists as to whether Lew lied on his Employment Application.

### III. CONCLUSION

After receiving the submissions of both parties and hearing oral argument on this matter, and for the reasons set forth above, it is hereby

**ORDERED,** that the defendant's motion for summary judgment pursuant to Fed. R.Civ. 56, is **GRANTED** as to the plaintiff's claim of discrimination based on his French national origin; it is further

**ORDERED,** that the defendant's motion for summary judgment pursuant to Fed. R.Civ. 56, is **DENIED** as to the plaintiff's claim of retaliation; it is further

**ORDERED,** that the defendant's motion to limit any damages which may be awarded to the plaintiff, is **DENIED,** it is further

**116**

ORDERED, that the Court will entertain an application for appointment of counsel, if any, made by the plaintiff. The plaintiff is directed to contact Allen J. Herzfeld, Esq., Eastern District *Pro Se* Clerk, to inquire about the procedure to make such an application; it is further

ORDERED, that the parties shall appear for a settlement conference on Thursday, March 5, 1998 at 9 A.M. in Courtroom A; and it is further

ORDERED, that the parties shall appear for jury selection on April 27, 1998 at 9 A.M. in Courtroom A.

SO ORDERED.