Patricia A. BEDARD

v.

ROGER WILLIAMS ·UNIVERSITY.

No. CIV. A. 96–324–T.

United States District Court,
D. Rhode Island.

Nov. 13, 1997.

Richard Savage, Savage & Savage, Warwick, RI, for Plaintiff.

Mark Nugent, Moira Reynolds, David Maglio, Morrison, Mahoney & Miller, Providence, RI, for Defendant.

### ORDER

TORRES, District Judge.

The recommendation contained in the Report of Magistrate Judge Lovegreen dated August 15, 1997, is hereby accepted.

### REPORT AND RECOMMENDATION

LOVEGREEN, United States Magistrate Judge.

The plaintiff, Patricia A. Bedard, is before this court seeking relief for alleged sex-based discrimination while she was employed by the defendant, Roger Williams University. Bedard asserts that the University discriminated against her in violation of Title IX of the 1972 Education Amendments, 20 U.S.C. § 1681(a) (1997), when it (1) failed to promote her to Athletic Director, (2) failed to treat her the same as similarly situated male employees, and (3) later terminated her. In addition to these federal questions, Bedard invokes this court's supplemental jurisdiction, 28 U.S.C. § 1367, and asserts pendent state claims under Rhode Island's Fair Employment Practices Act, R.I. Gen. Laws §§ 28-5-1 et seq., and Civil Rights Act of 1990, R.I. Gen. Laws §§ 42-112-1 et seq. The University now moves for summary judgement on the federal claims. This matter has been referred to me for preliminary review, findings, and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Local Rule of Court 32(c). A hearing was held on July 10, 1997. After weighing the arguments of counsel and the memoranda submitted, in addition to conducting independent research, I find that Bedard fails to marshal the requisite pretextual evidence of discriminatory animus. There being no genuine issue of material facts as to this necessary showing, I recommend that the University's motion for summary judgment be granted.

### Background.

Bedard is a university level physical education teacher and administrator. She holds both a bachelor's degree and a master's degree in physical education. Throughout college and graduate school she held a number of coaching positions. Bedard has either coached or assisted in coaching women's basketball and tennis at the high school and collegiate levels. Bedard also has experience with collegiate intramural sports.

The University is a private co-educational institution established in 1919 and accredited by the New England Association of School and Colleges. Its main campus is located in Bristol, Rhode Island. The university offers baccalaureate degrees in thirty-two majors from its nine schools. The University's faculty consists of three hundred full-time and adjunct professors, approximately eighteen per cent of whom are females. The athletic program is a Division III program and consists of eighteen varsity teams, three competitive club sport teams, an intramural program, and a recreation program. Between 1989 and 1992, the University received federal financial assistance.

Bedard was employed by the University in its athletic department from October 1989 to May 1994. Though initially hired as Assistant Athletic Director, Bedard served as Acting Athletic Director from October 15, 1992 through August 1, 1993. During this time, a

search committee was formed and directed to conduct a nationwide search for a qualified Athletic Director. The members of the search committee were hand-picked from the University's faculty, administration, and student body by William O'Connell, Director of Auxiliary and Student Activities. A seat on the search committee required a demonstrated, long-standing interest in the athletic department. Additionally, some members of the search committee were chosen because their professional duties at the University caused them to have interacted with the athletic department to some extent. Though this was the first time a committee was formed to recommend an Athletic Director, the University had employed similar committees on previous occasions to fill other positions in the athletic department, *see* Kemmy Dep. at 7–8 ("... I interviewed [for the position of intramurals recreation sports director] with [Dwight Datcher (then Athletic Director of the University)] and there was a—there was a committee as well, four people on that committee. Patty Bedard was one of them"), in addition to filling senior administrative positions in other departments, *see* O'Connell Dep. at 7–14.

As advertised, candidates for the position were expected to have a master's degree, three years of collegiate athletic administration and coaching experience, along with strong communication skills. Bedard applied for the directorship, but on August 1, 1993 the job was given to William Baird.

Thereafter, Bedard returned to her original duties, this time under the title of Associate Athletic Director until May 20, 1994. Almost immediately, Baird and Bedard both found it increasingly difficult to work with one another. O'Connell, Baird's direct supervisor and the person who hired Bedard, described their conduct as antagonistic. After months of conferences with both parties, O'Connell eventually sided with Baird. On February 10, 1994, Baird reprimanded Bedard in writing for failing to meet the duties and responsibilities of her employment. The letter set forth seven areas where Bedard's conduct was deficient. This list included, but was not limited to, failure at her fiscal responsibilities, failure to prepare for an athlet-

ic season, failure to sign a coaching contract, and various difficulties regarding her personal relations in the workplace. The reprimand warned that if the deficiencies went uncorrected they could result in termination.

On May 20, 1994, Bedard received a letter of termination from Baird citing several reasons for the action. This letter of termination had O'Connell's approval. After Bedard was terminated, she complained to the Dean of Students, Karen Haskell, who investigated the allegations of sex discrimination against Baird. This investigation consisted of interviewing four men and five women. As a result of the interviews, Haskell was convinced that the allegations had no factual basis and she reported the same to O'Connell.

Dissatisfied, Bedard sued the University alleging unlawful employment discrimination in contravention of Title IX, in addition to violations of Rhode Island law, through its failure to promote her to Athletic Director, its failure to treat her the same as similarly situated male employees, and its termination of her employment as Associate Athletic Director. In its motion, the University insists that Bedard cannot produce any material evidence to support her contentions.

**Discussion.**

█ Title IX, in pertinent part, provides: No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, ....

20 U.S.C. § 1681(a). While the statute does not expressly authorize private suits for employment discrimination, the Supreme Court has thrice visited the issue of private causes of action implicit in Title IX. In *Cannon v. Univ. of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), a female student sued the university for equitable relief from her allegedly wrongful exclusion from a medical education program based upon her gender. Dismissing the complaint, the district court held that the proper remedy was loss of federal funds. The Court disagreed and held that the student could maintain a private suit

despite no such express authorization under Title IX. *Id.* at 689–708, 99 S.Ct. at 1953–64 (applying the four factors of *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975), for determining whether Congress intended a statute to create a remedy; the Court found that Title IX was enacted for the benefit of a class of persons, that Congress intended to create a private remedy, that Title IX was fashioned after Title VI which had a private cause of action and that it was beneficial, particularly for the federal government, to allow a cause of action by implication). In *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), a female high school student sued her school district for damages arising from her alleged sexual harassment by a male coach. The district court dismissed, finding that Title IX did not authorize an award of monetary damages. However, the Supreme Court reversed, holding that Title IX conferred not only an implicit cause of action in that instance, but also implicitly authorized money damages as a remedy. *Id.* at 66, 112 S.Ct. at 1033 ("where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done"). The Supreme Court touched upon the viability of private claims for employment discrimination under Title IX in *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). In that case, the Court upheld the validity of administrative regulations promulgated by the Department of Education under Title IX which outlawed genderbased employment discrimination by federally funded education programs. *Bell* effectively expanded the meaning of the words "no person" found in section 1681(a) to include employees of the institution receiving federal funds. *Id.* at 520, 102 S.Ct. at 1917. The Court reasoned that, given Congress' intent for a broad sweep under Title IX, and

> [b]ecause § [1681(a)] neither expressly nor impliedly excludes employees from its reach, we should interpret the provision as covering and protecting these 'persons' unless other considerations counsel to the contrary. After all, Congress easily could have substituted 'student' or 'beneficiary' for the word 'person' if it had wished to restrict the scope of § [1681(a)].

*Id.* at 521, 102 S.Ct. at 1917–18 (footnote omitted). The Court also stated, in dicta, that "a female employee who works in a federally funded education program is 'subjected to discrimination under' that program if she is paid a lower salary for like work, given less opportunity for promotion, or forced to work under more adverse conditions than are her male colleagues." *Id.*

On the strength of these three precedents, this court agrees with those courts which predictively view the Supreme Court's "next logical step" as being to recognize a private cause of action under Title IX for employment discrimination against a federally funded education program. *Bowers v. Baylor Univ.,* 862 F.Supp. 142, 145 (W.D.Tex.1994); *see Preston v. Commonwealth of Virginia ex rel. New River Community College,* 31 F.3d 203, 205–06 (4th Cir.1994); *Nelson v. Univ. of Maine Sys.,* 923 F.Supp. 275, 278–79 (D.Me.1996). This position is by no means unanimous. Other courts have argued that to read a private cause of action for employment discrimination into Title IX would disrupt the "carefully balanced remedial scheme for redressing" such grievances as mandated by Congress through Title VII. *Lakoski v. James,* 66 F.3d 751, 754 (5th Cir.1995); *see Cooper v. Gustavus Adolphus College,* 957 F.Supp. 191, 193 (D.Minn.1997); *Howard v. Bd. of Educ. of Sycamore Community Unit Sch. Dist.,* 893 F.Supp. 808, 815 (N.D.Ill. 1995); *Wedding v. Univ. of Toledo,* 862 F.Supp. 201, 203–04 (N.D.Ohio 1994). Though the University did not raise this issue of subject-matter jurisdiction in its pending motion, it is free to do so at a later time if need be. *See* Fed.R.Civ.P. 12(h)(3).

■ As a general matter, Title IX discrimination claims are analyzed by analogy to the legal standards of Title VII. *Brown v. Hot, Sexy and Safer Prods., Inc.,* 68 F.3d 525, 540 (1st Cir.1995); *Preston,* 31 F.3d at 206–07; *Lipsett v. Univ. of Puerto Rico,* 864 F.2d 881, 896–97 (1st Cir.1988); *Nelson,* 923 F.Supp. at 279 & n. 2 (citing cases). Employment discrimination claims under Title VII must travel the well-worn path set forth by *McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In *McDonnell Douglas,* the Court set forth a flexible burden-shifting paradigm for the lower courts to follow in weighing employment discrimination claims based (as they often are) on circumstantial evidence. Though *McDonnell Douglas* dealt with racial discrimination, the paradigm applies equally to Title VII claims based upon sex discrimination. As a general matter, plaintiff has the original burden of presenting a *prima facie* case of employment discrimination. The burden then shifts to defendant who must respond by "articulating some legitimate, non-discriminatory reason for the employee's rejection." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. Once done, the plaintiff must prove that the defendant's stated reason was merely a pretext for discrimination. *Id.* at 804, 93 S.Ct. at 1825. The University moves for summary judgment on the ground that, based on the undisputed facts in the record and while drawing all reasonable inferences in her favor, Bedard is unable to carry the foregoing burdens.

Our rules of civil procedure state that a party shall be entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Hence, "a party seeking summary judgment [must] make a preliminary showing that no genuine issue of material fact exists. Once the movant has made this showing, the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trial worthy issue." *Nat'l Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995). An issue is "genuine" when a "reasonable jury, drawing favorable inferences, could resolve the fact in the manner urged by the nonmoving party"; a "material" fact is a "contested fact that has the potential to alter the outcome of the suit under the governing law if the controversy over it is resolved satisfactorily to the nonmovant." *Blackie v. State of Maine,* 75 F.3d 716, 721 (1st Cir.1996).

**The *Prima Facie* Case.** In *McDonnell Douglas,* the Supreme Court announced the standards for establishing a *prima facie* case of illegal employment discrimination. The Title VII complainant can carry the initial burden by establishing that (1) she belongs to a protected class, (2) she applied for and was qualified for the job for which the employer was seeking applicants, (3) despite her qualification, she was rejected, and (4) following rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. "The *prima facie* case requirement embodies a concept, not a mechanical exercise. Though its contours generally follow the *McDonnell Douglas* model, a *prima facie* case must be custom-tailored to fit both the particular animus (e.g., age discrimination, sex discrimination, race discrimination) and the particular type of employment decision involved (e.g., failure to hire, failure to promote, failure to retain)." *Sanchez v. Puerto Rico Oil Co.,* 37 F.3d 712, 719 (1st Cir.1994). As to the latter variable, judicial formulations abound. It is therefore not surprising that adversaries and judges will often disagree among themselves and with each other as to what elements to apply in a given case. Here, Bedard easily satisfies the first three elements because she was a qualified female applicant who was rejected for the position of Athletic Director. However, the fourth element presents a sticking point because it is ill-suited to situations, such as this one, where a pool of applicants are being considered sequentially. Larson, *Employment Discrimination* § 8.02[6], 45 (2d ed.1997). The problem lies in the fact that when one person is selected, all other applicants are simultaneously rejected, thus leaving the plaintiff unable to prove that the position "remained open."

Irrespective of which *prima facie* elements a court applies, plaintiff's burden at this initial phase is not onerous. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). Indeed, the Supreme Court has gone on to state that:

[w]here the defendant has done everything that would be required of him if the plain-

tiff had properly made out a *prime facie* case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to determine whether 'the defendant intentionally discriminated against the plaintiff.'

*United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94). Such is the case at bar. Based upon the above-quoted language, the First and Second Circuits have wisely concluded that courts " 'need not linger long over the question of whether [the plaintiff] in fact established a *prima facie* case' if the defendant has met its burden of articulating a legitimate non-discriminatory reason for its actions." *Johnson v. Allyn & Bacon, Inc.,* 731 F.2d 64, 70 (1st Cir.1984) (quoting *Sweeney v. Research Foundation of State Univ. of New York,* 711 F.2d 1179, 1184 (2d Cir.1983)). "Instead the reviewing court may focus on 'the ultimate question of discrimination *vel non.*' " *Id.* (quoting *Sweeney,* 711 F.2d at 1184). The court therefore assumes *arguendo* that Bedard has made out her *prima facie* case and, thus, a presumption of unlawful discrimination arises, if only for a moment.

**Legitimate Non–Discriminatory Reasons.** To rebut this presumption, the University must articulate legitimate, non-discriminatory reasons for its failure to promote and decision to terminate Bedard. To this end, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094 (citation and footnote omitted). This is done by introducing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by a discriminatory animus." *Id.* at 257, 101 S.Ct. at 1096.

As to its failure to promote Bedard, the record reflects that in order to fill the vacancy in the Athletic Director position the University sought out the best qualified applicant. The decision was then made to interview and rank applicants through a search committee. The committee itself was composed of university teachers, students, and university administrators, both male and female [1], who in the past had shown an interest in the athletic department. The committee conducted its search at a national level, soliciting applications from a diverse social demography. The group ranked applicants on a point system and then held interviews at its discretion. Once the committee had narrowed the number of applicants, it submitted the top three applicants to O'Connell. By its estimation, Baird ranked first, earning the highest point total and positive comments from the personal interview. Bedard, in the opinion of the search committee, was properly ranked fourth. O'Connell interviewed the committee's recommended applicants and ultimately agreed upon Baird.

The conduct and composition of the search committee could reasonably suggest a gender-neutral approach toward the hiring of a new Athletic Director. Clearly, there was an effort to include women on the search committee. Furthermore, there is sufficient evidence in the record from which a reasonable inference can be made that Bedard's application was fully reviewed. Indeed, Bedard was a prime candidate, but, unfortunately for her, the final round of the selection process yielded a more qualified applicant to whom the job ultimately went. There has never been any doubt that an employer retains the right to employ any person it chooses, so long as it does so without racial, ethnic, or sexual animus. "[T]he employer has discretion to choose among equally qualified candidates provided the decision is not based upon unlawful criteria." *Id.* at 259, 101 S.Ct. at 1097. Based upon the foregoing, a reasonable trier-of-fact could conclude that the University's decision not to promote Bedard to Athletic Director was not motivated by a discriminatory animus, but instead by its desire to hire

---

1. Originally, four of the eleven seats on the search committee were held by women. By the end of the process, only three women held seats as one of them appointed her seat to a male colleague.

what it perceived as the most qualified applicant. Therefore, any presumption of sex discrimination arising from the failure to promote has been rebutted.

As to Bedard's wrongful termination claim, the University insists that she was fired for poor performance as Associate Athletic Director. This assertion is principally supported by the letters of reprimand and termination which detail Baird's dissatisfaction with Bedard's performance. The letters demonstrate that Bedard was having problems meeting the expectations of Baird. In part, the reprimand stated that Bedard failed her administrative duties during June and August 1993, failed her fiscal responsibilities in September 1993, was insubordinate in December 1993, and in January 1994 failed at her supervisory duties. The termination letter cited poor performance and neglect of her fiscal responsibilities during the spring of 1994. Office memoranda written between Bedard and Baird evince Baird's dissatisfaction with Bedard's performance. When read consecutively, the memoranda present the picture of a work relationship deteriorating over a period of approximately five months. By May 1994, Baird decided to terminate Bedard, and sought and received O'Connell's permission to do so. "Job performance ... [is] widely recognized as [a] valid, nondiscriminatory bas[i]s for any adverse employment decision." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir.1996). Based upon the gender-neutral tone of the letters and memoranda, a rational trier-of-fact could conclude that the University's decision to fire Bedard was not motivated by a discriminatory animus, but by a dissatisfaction with her performance. Therefore, any presumption of sex discrimination arising from the termination has been rebutted.

■ **Discriminatory Pretext.** Bedard now must establish, by a preponderance of the evidence, that the University's proffered reasons were not the true reasons for its decision not to promote her and, later, to fire her, but were simply pretexts for gender-based discrimination. As to her wrongful failure to promote claim, Bedard argues that the University employed the search committee as a pretextual tool for discrimination. Without direct evidence of discrimination, the plaintiff needs to show circumstantial evidence sufficient enough to require the fact-finder to question the motives of the defendant. *Rossy v. Roche Prods., Inc.*, 880 F.2d 621, 624 (1st Cir.1989) (citing *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94). The classic proof would be if a less qualified male with no otherwise favorable characteristics was hired. *Evans*, 80 F.3d at 960.

As Bedard cannot avail herself of such proof, she challenges the timing of the formation of the search committee to fill the position of Athletic Director. Bedard relies on the fact that the University had traditionally hired its Athletic Directors from within the ranks of the athletic department, without employing a search committee. Discriminatory pretext, she argues, can be found in the fact that it was not until a female came up in line for the directorship that the University adopted a committee process and thereby selected a male outsider for the position. However, this argument is blunted when one considers the University's prior use of search committees. What's more, the choice to break with routine and hire an outsider was simply the product of the ranking system employed by the search committee. Bedard offers no evidence from any of the committee members from which one could reasonably infer that its composition or procedures reflected any gender bias. Bedard fails to make the vital link between the forming of the search committee and the allegation of sex discrimination. This is particularly true in light of the evidence regarding the national scope of applicants sought by the committee and the fact that O'Connell accepted the committee's recommendation of Baird, though he himself would have selected Bedard. On balance, Bedard fails to raise sufficient evidence which would lead a reasonable fact-finder to infer that the search committee, through it's actions or composition, more likely than not had harbored a discriminatory animus when it failed to promote her.

■ Bedard also comes up short on her burden of demonstrating that her termination was motivated by gender animus. To evince discriminatory pretext in this regard,

Bedard asserts that Baird deliberately assailed her with a "paper-trail" criticizing her performance while merely paying lip service to the misdoings of her male counterparts. This statement holds no water; the record undisputedly establishes that male departmental directors were subjected by Baird to both oral and written reprimands.

Next, Bedard claims that when the males were reprimanded, even for severe mistakes, they were never subjected to the same degree of sharp criticism to which she was held. She fails, however, to single out even one such instance in the record. At the summary judgment stage, such unsubstantiated assertions will no longer suffice to avoid judgment.

Bedard spends the balance of her time and paper waging a rear-guard, line-by-line assault on the validity of Baird's criticisms and reprimands. Clearly, Bedard and Baird did not see eye to eye, and their working relationship suffered dramatically for it. As the Athletic Director, Baird, with the support of the University, ultimately chose to settle their incompatibility through termination. To characterize Baird in a light most favorable to Bedard, it is evident that, as an Athletic Director, Baird was tough, demanding, outspoken, perhaps overly critical, and possibly irrational in some of these respects. However, the federal anti-discrimination laws do not protect an employee from even the most irrational or tyrannical acts of her employer, *see Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 16 (1st Cir.1994), so long as they are not borne of an unlawful animus. Bedard fails to provide this court with a drop of evidence from which a reasonable trier-of-fact could elicit such animus.

**Gender Harassment/Disparate Treatment.** The only other instance of alleged gender harassment/disparate treatment yet to be addressed involves Bedard's belief that Baird and her male colleagues in the department deliberately excluded her from after-hours golf outings and related social activities. Beyond the fact that Bedard cannot substantiate her belief, and ignoring the fact that these allegedly exclusive get-togethers took place outside the scope of her employment at the University, Bedard utterly fails to demonstrate how such "social iso-

lation" amounts to gender harassment. The federal anti-discrimination laws simply do not provide a remedy for this type of isolation when it cannot be shown, beyond mere speculation, that it was motivated by an illegal gender bias.

### Conclusion.

For the reasons stated previously, Bedard has failed to produce the requisite evidence of discriminatory pretext needed to sustain her federal claims against the University. Inasmuch, the University's motion for summary judgment as to those claims should be granted.

Having so recommended, the court is left with the state law claims under Rhode Island's Fair Employment Practices Act and Civil Rights Act, here on this court's supplemental jurisdiction. Such jurisdiction is proper if, at the outset, there is a substantial federal claim and the federal and state claims "derive from a common nucleus of operative fact." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Even when the *Gibbs* test is satisfied, the district court holds considerable discretion in exercising its pendent jurisdiction. *Id.* at 726, 86 S.Ct. at 1139. The Supreme Court has noted that, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988). Accordingly, the court should decline to exercise its jurisdiction over the remaining Rhode Island state law claims, *Compare Corrigan v. State of Rhode Island, Dept. of Business Regulation*, 820 F.Supp. 647, 664–65 (D.R.I. 1993), and dismiss them without prejudice.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. Fed.R.Civ.P. 72(b); Local Rule of Court 32. Failure to file specific objections in a timely manner constitutes a

waiver both of the right to review by the district court, *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604–05 (1st Cir. 1980), and the right to appeal the district court's decision, *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986) (per curiam).

Aug. 15, 1997.