Donna K. SKOUBY, Plaintiff–Appellant,

v.

The PRUDENTIAL INSURANCE COMPANY OF AMERICA, a corporation, Defendant–Appellee.

No. 96–4100.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 23, 1997.

Decided Nov. 26, 1997.

David C. Howard (argued), Kenneth H. Gibert, Howard & Associates, St. Louis, MO, for Plaintiff–Appellant.

Richard J. Pautler, Clifford A. Godiner (argued), Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, MO, for Defendant–Appellee.

Before POSNER, Chief Judge, and RIPPLE and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Rarely do we see such divergent explanations of events as exist in this employment discrimination case—brought under Title VII, 42 U.S.C. § 2000e *et seq.*—and we see lots of cases. In fact, we have become almost a super-personnel department, examining the employment history of various workers, reading about the risqué jokes they tell one another, and looking to see what a company has done or not done to discourage the employment of persons protected by the discrimination laws.

This is a worthy endeavor, an integral part of our work. But it seems that at some point we must question whether every unique, fact-intensive case should be set out in ponderous detail in the Federal Reporters. For the most part, only a smidgen, at best, of what we say in these cases advances anyone's understanding of the law. Most often, as was observed in *Hunt–Golliday v. Metropolitan Water Reclamation District of Greater Chicago*, 104 F.3d 1004, 1006–7 (7th Cir.1997), the law set out in the cases—our recent decision in *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177 (1997), being a notable exception—consists of no more than a recitation of the *McDonnell–Douglas* standards. And frankly it is hard to imagine that anyone reads these fact-intensive cases. Besides, people who want to do so, in this day of seemingly unlimited electronic information systems, are able to check up on what we say even if it is not officially printed. For that reason, we question whether the present opinion should be published. So it is with some sense of irony that we publish an opinion to voice the concern that we publish too much.

In this case, either Donna Skouby was subjected to sexual harassment and discrimination on her job and was dismissed when she complained; or she became unproductive when she turned her attention to her studies to become a nurse, rather than concentrating on her job, and she was dismissed as a result of a nationwide program instituted by The Prudential Insurance Company to weed out its unproductive agents. After her reinstatement—for unrelated reasons—she either was constructively discharged, in her view, or, in Prudential's view, quit to concentrate on her nursing studies.

██ Skouby's version first. She says that almost immediately after she began work for Prudential in 1985 at the Belleville, Illinois, district office she was subjected to harassment. Other agents placed a cartoon character of a male co-worker on her desk; the character was saying "I love you." Over the next several weeks eight to ten drawings

were presented to her, all including some reference to love or marriage. One of the drawings was of a body which had been slit—a match representing an erect penis was attached. At this point Skouby complained to her direct supervisor. She says that nothing changed as a result of her complaint. She also says she was subjected to constant unwelcome sexual references, including one agent asking another if he was "eating her." The men talked about going to a striptease club. They had brochures about football which, she says, featured a provocatively dressed woman on the cover. She saw a pervasive atmosphere of discrimination in her office. Male agents were given information and assistance with planning sales calls and were regularly assisted by their managers, while she was not. She filed a charge with the Equal Employment Opportunity Commission. Subsequently she lost her job.

Prudential's version is different. The company dismisses the harassment claim by saying that the conduct was not sufficiently severe to create an abusive environment and that furthermore, when she complained about a comment made by a fellow agent, the offending behavior stopped immediately. Also, as Prudential points out, most of the incidents fall outside the time period when her claims can be aired in court.

What Prudential sees is that her discharge was for poor performance. The decision was made by a vice-president of the region, not by the persons who she claims were the ones who discriminated against her. Most importantly, Prudential says that her discharge came as a result of a nationwide program instituted in August 1990. The program, known as Low Production Probation (LPP), was an effort to increase individual sales production. LPP required regional vice-presidents to examine the sales production of all agents at the end of 1990. Any agent, with exceptions not applicable here, who finished in the bottom 20 percent in production for his district was eligible to be placed on probation. An agent placed on probation would be required to meet or exceed the 1990 district sales average during each of the next four quarters or be discharged. No person could be placed on probation if another person with lower production figures was not. On October 26, 1990, Skouby, like all agents in the bottom 20 percent of production in their districts, received a warning letter. It was after she received the warning letter that Skouby filed her EEOC charge. She finished 1990 in last place in production. In early 1991 John Greene, the regional vice-president of her district, put 21 agents on probation, 14 men and 7 women. From Belleville, two agents were placed on probation; Skouby (who was notified of her probation in March) and another woman. They were last and second to last in sales. The next lowest producer had a sales volume 40 percent higher than theirs. Skouby did not meet the LPP requirement during her first quarter on probation and she was terminated on July 19, 1991–as were numerous other agents around the country.

However, the union representing the agents filed a nationwide grievance contending that the company gave insufficient notice of the LPP program. The union won in arbitration; reinstatement was ordered for all terminated agents. As a result, Skouby was reinstated on October 21, 1991. Although the order required that agents be reinstated to their former agencies if that was possible, Skouby's agency had no openings, so she was placed in an agency which was smaller and consequently her service commissions were $27 per week lower than they had been. Prudential, however, advised her that it would transfer to her the business she had written in her former agency. She was asked to help with the transfer, which she did for only one day. Prior to her discharge Skouby had also been registered with the National Association of Securities Dealers, but her registration was terminated when she was discharged. When she returned to work she was given a new application and she was reinstated November 6, 1991. She resigned from her position at Prudential on January 10, 1992.

Prudential also says that when Skouby began to work for the company in 1985 her sales production was generally satisfactory. Her sales declined, however, when she began a pre-nursing course in 1989. In 1990 she began full-time study in a nursing program.

As the company puts it, while her sales declined, her grade point average in her nursing studies rose from 3.0 to 3.457. Prudential's view is that she was more interested in becoming a nurse than in being an insurance agent. The next job she took after quitting this one was in nursing.

So we have two sides to the story—or, more accurately, we have two separate stories, for they are stories which may not necessarily be mutually exclusive. It might be possible for someone to be subjected to sexual harassment and discrimination and still be dismissed for low production in some entirely unrelated company program. It might even be possible to show that one's poor production, resulting in the probation, was a result of the effects of discrimination. Lots of things are possible.

What is not possible in this case is to trust Skouby's version of the events as set out in her brief. Prudential accuses her of misstating the facts, or stating as fact events which are not in the record. For example, Skouby says that when she was on leave from work, a commission which should have been credited to her account was credited instead to a male agent who acted for her in her absence. When Skouby complained to her immediate supervisor, he refused to correct the error. She says that when she complained to the supervisor at the next level, a fellow named Larry Clark, he took no action. She cites Clark's deposition to support her claim. But at his deposition, what Clark said was that the error was corrected and the immediate supervisor was counseled about the incident. Her response, set out in her reply brief, to the accusations of inaccuracy which Prudential makes was stricken by this court as being even less tied to the record and less reliable than her original brief. Also we note that as a plaintiff—who one might think would want her version of events set out clearly—Skouby was notably obstreperous in her deposition. She was asked whether she changed careers when she became a nurse after she left Prudential, where she had, as we said, been an insurance agent:

Q. So is it fair to say, then, that after leaving Prudential in January of 1992, you changed careers out of the insurance industry and into the health related field?

A. I think that the insurance industry is a health related field, so, no, I have not changed careers, if you look at it from that viewpoint.

Q. Okay. Well, explain to me how insurance is in the health related field?

A. Well, for one thing, Prudential, and most major insurers, have life insurance as a major product, and health insurance.

Or when she was asked about the courses she took during the time she was employed by Prudential and whether those courses were business courses applicable to her employment as an agent:

Q. . . . Introduction to Anthropology, that was one class; right?

A. Right.

Q. Do you consider that a business class?

A. It depends on what your business is.

She did, then, acknowledge that anthropology was "probably not" relevant. But despite her begrudging acknowledgment of virtually incontestable facts, her approach to this case has been less than desirable.

But we will avoid edging too close to credibility issues and factual disputes. The case was decided on summary judgment, and our *de novo* review shows that even if we accept all of what Skouby says that is supported in any, even marginal, fashion in the record, summary judgment was properly granted.

Most of the events Skouby complains of fall outside the relevant time period, which would be 300 days prior to the filing of her EEOC charge in November 1990. But even if they did not, the incidents of harassment do not meet the standards set out in our cases, such as *Koelsch v. Beltone Electronics*, 46 F.3d 705 (7th Cir.1995), and *Baskerville v. Culligan*, 50 F.3d 428 (7th Cir.1995). *Koelsch* involved incidents of physical contact between the president of the company and the employee which were found insufficient to support a claim. In Baskerville we found that eight offensive comments did not add up to harassment. Likewise, Skouby's examples are not "sufficiently severe or pervasive to . . . create an abusive work environment." *Koelsch* at 708.

■■ Her .claim that sexual discrimination or retaliation played a part in her discharge in July 1991 also fails. She does not have direct proof that Greene's decision to place her on probation was made in a discriminatory fashion. Her discharge followed from her poor performance on probation. And under *McDonnell–Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), she cannot establish a prima facie case nor that the legitimate, nondiscriminatory reason for her discharge was pretextual. Her prima facie case fails because she cannot show that she was meeting her employer's expectations. If nothing else, it seems clear that her performance was dismal compared to the performance of others. Secondly, rarely is a legitimate, nondiscriminatory reason for a termination so unassailable as it is in this case. The LPP program was a national program designed to weed out unproductive agents, males and females alike. That the program was found, from a labor-management point of view, to have been instituted without sufficient notice to the agents does not detract from the conclusion that it was nondiscriminatory for Title VII purposes. It clearly applied to everyone. Skouby was discharged under the program and has not shown that the program was a pretext for discrimination.

■ Her claim that she was constructively discharged in January 1992, after her return to work when all the agents discharged pursuant to the LPP program were reinstated, is without merit. To be constructively discharged requires that the working conditions be made so intolerable that a reasonable person would be forced to resign. *Weihaupt v. American Med. Ass'n*, 874 F.2d 419 (7th Cir.1989). Nothing which happened to her in the two months after she returned to Prudential approaches the sort of event which might give rise to a constructive discharge. The decision of the district court is

AFFIRMED.