**Bernice M. COWAN, Plaintiff–Appellant,**

v.

**PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant–Appellee.**

No. 97–1871.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 1997.

Decided April 10, 1998.

---

Bernice M. Cowan (argued), Chester, IL, for Plaintiff–Appellant.

Clifford A. Godinerd (argued), Thompson & Coburn, St. Louis, MO, for Defendant–Appellee.

Before POSNER, Chief Judge, and CUMMINGS and MANION, Circuit Judges.

MANION, Circuit Judge.

Bernice Cowan was a commissioned insurance agent for Prudential Insurance Company of America. When her sales production dropped to the second lowest in her office, she was terminated but later reinstated by an arbitrator. Soon thereafter she took disability leave and was again terminated when she did not return to work after her leave expired. She sued Prudential for sex discrimination, retaliation, and constructive discharge. Cowan appeals from the district court's summary judgment for Prudential. We affirm.

## I. Facts

In February 1989 Bernice Cowan began working for Prudential Insurance Company of America. Cowan worked in Prudential's Belleville, Illinois office, and claims that during the course of her employment she was treated less favorably than her male coworkers, and that she was subjected to a hostile work environment. (The particulars of these claims will be discussed in greater detail later.) Cowan also claims that when Prudential terminated her on July 22, 1991 it was because of her sex. Prudential claims that it terminated Cowan pursuant to its new nationwide "Low Production Probation" policy which ultimately authorized the termination of agents whose sales were in the bottom 20% of the agency; the Low Production Probation policy was instituted in August 1990, and in December 1990, Cowan ranked 39 out of 41 sales agents in the Belleville district, and by the end of December Cowan finished second to last among all Belleville sales agents.

After Cowan and a number of other Prudential agents were terminated under the Low Production Probation policy, the agents' union filed a nationwide grievance claiming that the policy constituted an unfair labor practice. The union and Prudential arbitrated the dispute. The union prevailed; the arbitrator ordered Prudential to offer reinstatement to all discharged agents.

Cowan accepted Prudential's offer of reinstatement and on October 21, 1991 Prudential reinstated her, although because there were no openings in the Belleville office, it assigned Cowan to the Cahokia office. Cowan claims that this constituted retaliation. Cowan also asserts that after she returned to work, co-workers retaliated against her by treating her negatively or ignoring her outright, and that this made it impossible for her to do her job. This, coupled with the location of her new assignment, caused what she perceived to be a constructive discharge.

Prudential moved for summary judgment, arguing that Cowan failed to prove that the environment at Belleville was objectively hostile, or that she was treated less favorably than male co-workers, and that it terminated Cowan because of her poor performance and not because of her sex. Finally, Prudential argued that there was no evidence supporting Cowan's retaliation or constructive discharge claims. The district court granted Prudential summary judgment on all counts. Cowan appeals.

## II. Analysis

As we routinely recite in these cases, summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c); we review the district court's grant of summary judgment *de novo* viewing the record in the light most favorable to the nonmoving party. *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1139 (7th Cir.1997). With these standards in mind, we turn to each of Cowan's Title VII claims.

### A. *Hostile Work Environment*

 The Supreme Court enlarged the scope of sex discrimination under Title VII by validating a claim for sexual harassment emanating from abusive conditions in the workplace that we now call a hostile work environment. "[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). "[F]or sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employ-

ment and create an abusive working environment." *Id.* at 67, 106 S.Ct. at 2405. This requires that the conduct "adversely affect the work performance and the well-being of *both* a reasonable person *and* the particular plaintiff bringing the action...." *Brooms v. Regal Tube Co.*, 881 F.2d 412, 419 (7th Cir. 1989).

■ In support of her hostile environment claim, Cowan relies on her deposition testimony, an affidavit she filed after her deposition, and an affidavit filed by Donna Skouby in a separate suit Skouby filed against Prudential alleging sex discrimination. In her deposition, Cowan proffered three instances that she claimed were sexual harassment: (1) the use of a provocatively dressed cheerleader in Prudential's 1990 Football Manual, which was printed for voluntary distribution to clients; (2) the circulation in the Belleville office of a cartoon depicting two safes involved in "safe sex;" and (3) a comment made by plaintiff's district manager Larry Clark that he could do like the plaintiff and "abstain from sex." Later in an affidavit Cowan presented some additional facts as supporting her sexual harassment claim: her supervisor refused to talk to her except when it was absolutely necessary and he snubbed her in a variety of ways, such as pointedly greeting each sales representative by name except for her; men went on fishing, golfing and other social outings with each other and women were not invited to these events; on Saturday mornings male agents and managers loudly called each other crude names (which were derogatory to women); once in her presence her immediate supervisor Michael Pierce loudly referred to women as "blood-suckers," "leeches" and "dizzy broads"; the men, including the sales managers, made frequent in-office reference to PT's, a strip club in Centreville, and they would make plans to go there, or discuss their exploits at PT's approximately once per month; on one occasion, some agents circulated in the office a photograph that another agent had had taken with a stripper; sexual joking was rampant within the Belleville office; and Larry Clark asked Cowan why she did not "just get married and let some man take care" of her.

■ Prudential argues that we should exclude the incidents which Cowan set forth in her affidavit because she did not include them in her deposition testimony. "We have long followed the rule that parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions." *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir.1996). We have also made clear that a deposition is the time for the plaintiff to make a record capable of surviving summary judgment—not a later filed affidavit. However, we also recognize that an affidavit is not meritless if "it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir.1995). While there is no plausible explanation for a lapse of memory here, our review of Cowan's deposition testimony illustrates that perhaps the questioning was confusing.

In Cowan's deposition, Prudential's attorney began by asking: "Ms. Cowan, are you claiming in this lawsuit that you were sexually harassed when you worked at Prudential?" She replied: "There was one comment made to me that I considered inappropriate." Question: "Okay. Why don't you tell me who made that comment? Let's start there." Cowan then explained the circumstances surrounding the "abstain from sex" comment (and that Clark, who had made the statement, apologized the next morning). After explaining the incident she said: "There was also what I considered a very demeaning book that was published by Prudential." Prudential's attorney interrupted by saying: "Why don't I stop you, and I apologize, Ms. Cowan. What I want to do is get the details on the first one, then we'll talk the book. I will give you an opportunity, I promise." Prudential's attorney then asked Cowan more questions about the first incident. After that the attorney asked: "Now, you were starting to tell me, and I'll let you tell me about this demeaning book you called it?" Cowan then explained about the football

book issued in 1989 or 1990, which included a photo of a scantily-clad cheerleader, for which the corporation later issued a companywide apology and canceled the printer's contract. The attorney then said: "any other incidents or comments relating to sexual harassment?" Cowan replied: "Well, there was a mimeographed dirty joke that was distributed in the office one day. I'm not really sure what the origin of it was, but it was very offensive." The attorney then asked Cowan some more specific questions regarding the cartoon, and then the following exchange took place:

Q. Did you complain to anybody at Prudential about this cartoon?

A. I talked with some of the agents on our staff. It was very-

Q. Did you talk to anybody in management?

A. As I recall, I believe Mike Pierce was standing there when I was discussing my disgust with it with the other agents, but I can't remember specifically saying to him. As I recall, I believe he was standing there when I was discussing it with some of the other agents on my staff.

Q. And do you remember if Mike Pierce said anything?

A. I don't remember.

Q. Anything else?

A. Not that I recall.

From there Prudential's attorney questioned Cowan about Prudential's sexual harassment policy.

Cowan claims that she understood the question "anything else" to mean anything else related to the incident about the safe sex cartoon, and that since there was nothing more concerning that event, she replied "no." But Prudential now explains that it meant were there any other instances of sexual harassment. Given the ambiguity of the question "anything else," we do not conclude that Cowan's understanding of it was unreasonable. We note, however, that our willingness to look at the additional evidence contained in Cowan's affidavit subsequent to her deposition is based on the specific circumstances of this case. The general rule re-

mains intact. *See Brill v. Lante Corp.*, 119 F.3d 1266, 1274 n. 4 (7th Cir.1997) ("Brill was asked a series of open-ended questions in her deposition that provided her with ample opportunity to describe each incident she believed constituted harassment. That was her chance to make a record capable of surviving a motion for summary judgment, which is why we generally discount—indeed, disregard—an affidavit that is in conflict with a party's deposition testimony.").

■■■■ Cowan also attempts to rely on an affidavit filed by Donna Skouby. Skouby was a co-worker of Cowan's and also sued Prudential for sex discrimination under Title VII and, more specifically, a hostile work environment claim. In her case, Skouby proffered an affidavit detailing what she considered sexual harassment. Cowan attempts to rely on these additional facts to support her hostile work environment claim. She cannot, for three reasons. First, the Skouby affidavit was not made part of the district court record in Cowan's case. Second, there is no evidence that Cowan was ever exposed to the same circumstances as Skouby. Third, because only harassment which subjectively offends the plaintiff is actionable, a plaintiff cannot rely on what another plaintiff claims to be offensive if it is not also offensive to the plaintiff, and here there is nothing in the record to establish this. *Brooms*, 881 F.2d at 419 (conduct must "adversely affect the work performance and the well-being of *both* a reasonable person *and* the particular plaintiff bringing the action...."). Moreover, this court has already affirmed the district court's grant of summary judgment denying Skouby's sexual harassment claim. *Skouby v. Prudential Ins. Co. of Amer.*, 130 F.3d 794 (7th Cir.1997). Cowan does not fare any better based on the same allegations. For these reasons, Cowan's reliance on Skouby's affidavit is misplaced.

■■■■ That leaves the incidents described in her deposition and affidavit and set forth above. Taking these incidents together, even if they offended Cowan, the atmosphere at Belleville was not severe enough or pervasive enough to create an objectively hostile work environment. We reach this conclusion by looking "at all the circumstances, includ-

ing the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferences with an employee's work performance...." *Gleason*, 118 F.3d at 1143–44. First of all, some of the alleged incidents were not even sexual in nature, for instance the cold shoulder Cowan received from co-workers. *See Brill*, 119 F.3d at 1274 (rejecting attempts to buttress sexual harassment claim with incidents that had nothing to do with sex and for that matter were not particularly sexual in nature). Likewise, the fact that some co-workers decided to associate with others outside of work by golfing or fishing does not constitute sex discrimination, much less create a hostile work environment (unless of course it was a company-sponsored event from which the women were excluded). That is true even if the men only want to associate with other men in their free time. *See Bedard v. Roger Williams University*, 989 F.Supp. 94, 1997 WL 769363 (D.C.R.I. Nov.13, 1997) (recognizing that "federal anti-discrimination laws simply do not provide a remedy for ... social isolation and exclusion from outings which took place outside the scope of employment"). *Compare, Doria v. Cramer Rosenthal McGlynn, Inc.*, 942 F.Supp. 937, 946 (S.D.N.Y.1996) (exclusion from company-sponsored events such as lunches and golf and tennis outings may constitute illegal discrimination if exclusion is based on the individual's sex). Of the remaining incidents, they were fairly sporadic: the derogatory name-calling (not directed at her) occurred only on Saturday mornings; the conversation among co-workers about visits to the strip club was limited to about once a month; the safe-sex cartoon, the remarks to Cowan about refraining from sex and getting married, the football photograph and the stripper program were five unrelated incidents (two of which were followed by apologies) which occurred over the two years of Cowan's employment. *Brill*, 119 F.3d at 1274 (rejecting sexual harassment claim, noting: "Not only are the three incidents fairly benign, but they are spread over at least a 12–month period. 'A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage.'") (quoting *Baskerville v. Culligan Intern. Co.*, 50 F.3d 428, 431 (7th Cir.1995)). Additionally, none of the incidents were physically threatening, and most were not severe. Finally, only two of the alleged incidents were directed at Cowan, and "as this court has recognized, the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." *Gleason*, 118 F.3d at 1144. *See also, Brill*, 119 F.3d at 1274 (discounting harassment directed at someone other than plaintiff). In short, while crude, sometimes offensive, and inappropriate, the Belleville atmosphere did not rise to the level of hostile.

A comparison to Seventh Circuit precedent substantiates our conclusion that Cowan's workplace was not a hostile environment. For instance, in *Baskerville*, 50 F.3d 428, we held that the plaintiff's supervisor had not engaged in actionable sexual harassment even though over a seven-month period he: (1) called the plaintiff a "pretty girl"; (2) made grunting sounds when the plaintiff wore a leather skirt; (3) said to the plaintiff that his office was not hot "until you walked in here"; (4) stated that a public address announcement asking for everyone's attention meant that "all pretty girls [should] run around naked"; and (5) alluded to his wife's absence from town and his loneliness, stating while making an obscene gesture that he had only his pillow for company. 50 F.3d at 430–31. Similarly in *Gleason*, 118 F.3d at 1144–45, we concluded that the plaintiff's allegations that the manager referred to female customers as "bitchy" or "dumb," appeared to ogle other female employees, flirted with employee's female relatives, commented on one co-worker's anatomy, told an employee he spent the weekend at a nudist camp, and told the plaintiff he dreamed of holding her hand, were insufficient to support a hostile work environment claim. And in *Brill*, 119 F.3d at 1274, we concluded that a female employee failed to establish that the office environment constituted sexual harassment where over a twelve-month period, co-workers once directed sexual comments about women toward a male employee, the company's president on one occasion described another woman's breasts and face to a male

employee, and the manager once told the employee who was single and pregnant that he disapproved of premarital sex. While it is difficult to discern the "line that separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing," *Gleason,* 118 F.3d at 1144, these cases help draw the line in the present case to conclude that Cowan cannot succeed on her hostile environment claim. *See also Skouby v. Prudential,* 130 F.3d 794 (7th Cir.1997) (holding that Cowan's co-worker Donna Skouby did not present sufficient facts by which to establish an objectively hostile work environment.) [1]

▇ One last point before leaving Cowan's hostile work environment claim: In support of her claim, Cowan points to other incidents where male employees allegedly were treated better than female employees. For instance, Cowan claims that her supervisor continued to work more intensively with a new employee than he did with her. If adequately supported, such disparate treatment could constitute a claim of outright discrimination—not a hostile work environment. (We say "could" because the disparate treatment must be based on sex or some other illegal criteria; mere favoritism of one employee over another is not enough.) But since Cowan has not adequately supported her allegations with specificity, they too fail. *See Essex v. United Parcel Service, Inc.* 111 F.3d 1304, 1311 (7th Cir.1997) (an equivocal statement in the plaintiff's affidavit concerning what the plaintiff perceived as similarities between the plaintiff and a white employee was too general to show that the other employee was similarly situated ). Moreover, Cowan cannot succeed because the new employee who she complains was treated more favorably than she was just that—new—and thus not similarly situated to her.

## B. *Sex Discrimination*

This brings us to Cowan's second claim of sex discrimination—that she was placed on probation and eventually discharged because of her sex. As noted earlier, in August 1990, Prudential implemented a new nationwide low production probation policy in an effort to increase emphasis on individual sales production. The policy required Prudential's regional vice presidents to examine the sales production of all agents at the end of 1990. Any agent who had worked for Prudential throughout 1990, had not been disabled, and finished in the bottom 20% in sales production for his or her district could be placed on probation. Any agent placed on probation by a regional vice president would be required to meet or exceed the 1990 district sales average during each of the next four quarters, or be automatically discharged. Under the program, no person could be placed on probation if a lower-ranked eligible agent in the district was not also placed on probation.

In October 1990, Cowan received a letter from the Regional Vice President warning her that she ranked in the bottom 20% of the Belleville District producers, and that she risked being placed on probation if she remained there at the end of 1990. However, even after the warning, Cowan's sales performance worsened and she ended the 1990 year second-to-last. In early 1991, John Greene, the Regional Vice President responsible for the Belleville office, had to decide which of the agents in his region who were eligible for probation would be placed on probation. In the end, Greene placed 21 agents in his region on probation, including 14 men and 7 women. From the Belleville district, Greene placed Cowan and Donna Skouby on probation. Greene explained in his affidavit that he did so because Cowan and Skouby were second-to-last and last in sales, respectively, and the next lowest producer had significantly higher sales (more than 40% higher than Cowan).

---

**1.** Additionally, it is likely that many of the incidents of which Cowan's complained occurred outside of the 300 day statutory period for filing an EEOC complaint. That was true in the parallel case of *Skouby v. Prudential,* and is likely true here because Cowan did not file the charge of discrimination until August 13, 1991. However, it is impossible to tell from this record because it does not contain the dates of the alleged harassment. Nonetheless, even if they all took place within the statutory period, they were still not severe enough or pervasive enough to be actionable.

Prudential notified Cowan in March 1991 that she had been placed on probation and that her first probation quarter would run from April to June 1991. In order to avoid discharge, Cowan's "net sales credits" during the quarter had to total 733,464, which was one-quarter of the sales credits earned by the average agent in Belleville during 1990. At the end of the quarter, Cowan's sales credit totaled only 15,890—not even close. Because Cowan did not satisfy the probation requirements, she was terminated automatically in July 1991.

Cowan claims that both Prudential's initial decision placing her on probation and its later termination were the result of sex discrimination. She attempts to prove this both directly and indirectly. To prove discrimination directly, Cowan must present "evidence which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption." *Cowan v. Glenbrook Sec. Services, Inc.*, 123 F.3d 438, 443 (7th Cir.1997) (quoting *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir.1997)). "This evidence 'must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question.'" *Cowan*, 123 F.3d at 443 (quoting *Randle v. LaSalle Telecomm., Inc.*, 876 F.2d 563, 569 (7th Cir.1989)).

As direct evidence Cowan points to Michael Pierce and Larry Clark's alleged animus against women. But as the district court concluded, neither Clark nor Pierce made the decision to terminate Cowan—John Greene made that decision himself. Cowan nonetheless attempts to impute Pierce and Clark's alleged animus to Greene because Greene's knowledge of Cowan's performance came from Clark. However, just because Greene learned of Cowan's poor performance from others, does not mean that he was not the sole decision maker. *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 396 (7th Cir.1997) (finding that person was the sole decision-maker despite the fact that the decision-maker consulted with others). The evidence established otherwise-that Greene alone made the decision to place Cowan on probation and that he reached this decision

because she ranked second-to-last in sales and that the next lowest agent had sales 40% higher than Cowan's. Her claims of sexual animus do not obscure the objective fact that her sales performance was far below par. And it was the numbers on which Greene relied, not any other subjective information obtained from Clark and Pierce. Therefore, Cowan has failed to present direct evidence that relates to the specific employment decisions in question, namely her probation and termination.

Cowan also attempts to use the burden-shifting mechanism of *McDonnell Douglas* to prove sex discrimination. Here too she fails. Cowan has presented neither evidence that she was meeting her employer's legitimate expectations, nor evidence to establish that Prudential's legitimate, nondiscriminatory reason for her discharge—her poor performance—was pretextual. While not quite as low as Skouby's, Cowan's performance was greatly lacking. And as we noted in *Skouby*, "rarely is a legitimate, nondiscriminatory reason for a termination so unassailable as it is in this case. The LPP program was a national program designed to weed out unproductive agents, males and females alike. That the program was found, from a labor-management point of view, to have been instituted without sufficient notice to the agents does not detract from the conclusion that it was nondiscriminatory for Title VII purposes. It clearly applied to everyone." *Skouby*, 130 F.3d at 798. Cowan likewise fails to carry her burden.

## C. Retaliation

Cowan next claims that Prudential retaliated against her after being ordered to reinstate her. Specifically she claims that Prudential retaliated against her by: (1) assigning her to the Cahokia agency; (2) canceling her National Association of Securities Dealers Series 6 registration; (3) inaccurately keeping her payroll records; and (4) treating her with coldness and indifference upon her return.

To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in a statutorily protected activity;

(2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse action. *Collins v. State of Ill.*, 830 F.2d 692, 702 (7th Cir.1987). Cowan's case falters at least by the third element (although whether she has presented an adverse action is certainly questionable). Cowan failed to present any evidence tying the claimed adverse actions to her protected activities.

First, Prudential presented evidence that it canceled her NASD registration because NASD by-laws required it to do so when a salesperson was terminated; Cowan did not counter this evidence. In fact, NASD reinstated her license within a week after her return. Cowan presented no evidence that the payroll problems were anything other than typical problems in a large organization and were instead somehow tied to her protected activities. Cowan also fails to link the staff's alleged indifferent behavior to her earlier complaints of sexual harassment. Although she claims two employees told her they were told not to talk to her, this evidence is hearsay on hearsay and is inadmissible. Finally, as to Cowan's assignment to the Cahokia agency, Prudential presented evidence that there were only two agencies open and that one was assigned to Cowan and the other to Skouby. Cowan has not presented any evidence that they assigned her to Cahokia out of retaliation, so this too must fail.

### D. *Post–Reinstatement Discrimination*

In her brief, Cowan also argues that upon her reinstatement she was subjected to a hostile work environment and that she still did not receive the same treatment as the male agents. However, she fails to present any specific evidence supporting these allegations, so this claim also fails. She likewise asserts that she was forced to take disability leave and eventually left Prudential and that this constituted a constructive discharge. However, in her deposition Cowan explained that the events which triggered her disability leave involved two assaults by street thugs in Cahokia-not anything Prudential did. Moreover, because her assignment to Cahokia was not discriminatory, she cannot bootstrap the unrelated assaults to her discrimination claim to allege a constructive discharge claim. In short, Cowan failed to present sufficient evidence to establish that she suffered from illegal discrimination upon her reinstatement.

### III. Conclusion

While Cowan may have suffered from an unpleasant working atmosphere, it was not severe or pervasive enough to constitute a hostile work environment. Cowan also did not suffer from sex discrimination; her probation and termination were the direct result of her inability to perform the legitimate expectations of her employer. Finally, because Cowan failed to present evidence of retaliation or a constructive discharge, these claims also fail. We AFFIRM.